# <u>EXHIBIT A</u>

1

```
                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF VIRGINIA
                        Alexandria Division




------------------------------:
                              :
UNITED STATES OF AMERICA      :
                              :
                              :
     -vs-                     :   Case No. 1:15-cr-290
                              :
                              :
ARNULFO FAGOT-MAXIMO,         :
               Defendant.     :
                              :
------------------------------:




              JURY SELECTION and OPENING STATEMENTS


                     November 27, 2018


             Before:   Liam O'Grady, USDC Judge


                       And a Jury




APPEARANCES:

Thomas W. Traxler, James L. Trump, and Anthony T. Aminoff,
Counsel for the United States

Mark J. Petrovich and Thomas B. Walsh,
Counsel for the Defendant

The Defendant, Arnulfo Fagot-Maximo, in person
```

2

1           NOTE:  The case is called to be heard in the absence

2    of the jury panel as follows:

3    JURY PANEL OUT

4           THE CLERK:  The Court calls case 1:15-cr-290, the

5    United States of America versus Arnulfo Fagot-Maximo for a jury

6    trial.

7           May I have the appearances, please, first for the

8    Government.

9           MR. TRAXLER:  Good morning, Your Honor.  Tommy

10   Traxler on behalf of the United States.  And with me at

11   counsel's table, Your Honor, are Jim Trump and Anthony Aminoff

12   on behalf of the United States.

13          MR. TRUMP:  Good morning, Your Honor.

14          MR. TRAXLER:  And behind us, Your Honor, are E.J.

15   Kelly, a task force officer with the DEA, and he will be the

16   Government's agent at trial, with the Court's permission.

17          And then Marilu Vargas and Heather Lee, paralegals

18   who are working with us.

19          THE COURT:  All right.  Good morning to each one of

20   you.  I'm sorry, the agent's last name?

21          MR. TRAXLER:  E.J. Kelly, Your Honor.

22          THE COURT:  Okay.  Agent Kelly.  All right.

23          MR. PETROVICH:  Good morning, Your Honor.

24          THE COURT:  Mr. Petrovich.

25          MR. PETROVICH:  Good morning, Your Honor.  Mark

3

1    Petrovich on behalf of Mr. Fagot-Maximo.  I'm here with

2    counsel, co-counsel, Thomas Walsh.

3            Baabak Zarrabian, who is here as our law clerk to

4    help us on some matters on the back table.

5            THE COURT:  All right, good morning to each one of

6    you.

7            Good morning, Mr. Fagot-Maximo.

8            And let's swear our interpreter, please.

9            NOTE:  The interpreter is sworn.

10           INTERPRETER LEFEBVRE:  For the record, Ana Lorena

11   Lefebvre, federally certified court interpreter.

12           THE COURT:  All right.

13           INTERPRETER LEFEBVRE:  Your Honor, two other

14   interpreters are coming, but they are in a hearing with Judge

15   Brinkema.

16           THE COURT:  Okay.

17           INTERPRETER LEFEBVRE:  So they will come shortly.

18           THE COURT:  All right.  Well, good morning to you,

19   and thank you for serving.  Please remind us to swear our

20   additional interpreters when they do appear this morning.

21   We'll try and remember ourselves, but if you ill let us know if

22   we forget.  All right?

23           INTERPRETER LEFEBVRE:  I will do so.

24           THE COURT:  All right, thank you.

25           All right.  Any preliminary matters, Mr. Traxler?

4

1          MR. TRAXLER:  Yes, Your Honor, just a few.  First,

2   the Government originally was planning on introducing a Spanish

3   recording that was made by one of the Government's witnesses,

4   Devis Leonel Rivera Maradiaga, who commonly goes by Leo

5   Cachiro.  It's a recording that Mr. Leo Cachiro made of a

6   couple of co-conspirators in this case.

7          And the Government had contracted with Johnnie

8   Benningfield to prepare a Spanish-to-English translation of

9   that recording, and these are Exhibits 105 and 106.  And the

10   Government was going to introduce Mr. Benningfield as an expert

11   in Spanish-to-English translation.

12          We have since decided not to use those recordings,

13   we're not going to introduce either the recordings or the

14   Spanish-to-English translation.  And we would like for Mr.

15   Benningfield to be excused from attending trial.  He was going

16   to attend trial on Thursday.  He has a pretty limited schedule

17   because he is in such high demand.  And we would like for

18   permission for him not to attend.

19          My understanding is defense counsel has informed us

20   that they would like to use him.  I don't believe -- well, I'll

21   let Mr. Petrovich speak.  I don't believe it's for this

22   specific translation but for other translations that they want

23   to introduce through evidence.

24          We do not believe that is a proper use of the

25   Government's expert in the Government's case on the

5

1    Government's dime.

2            The other issue, Your Honor, is Mr. Aminoff will be

3    delivering the opening statement for the Government, and he

4    plans on using a PowerPoint with exhibits that we plan to admit

5    during the trial.  We sent that PowerPoint over to defense

6    counsel yesterday and asked if they had any objections.  We

7    haven't heard any.

8            And we just wanted to front for the Court that we

9    will be using that PowerPoint during the opening statement.

10           And Mr. Trump, who is going to be handling jury

11   selection for us, wanted to raise a few issues pertaining to

12   the defendant's proposed voir dire questions.

13           THE COURT:  Okay.  All right, let's see.

14           All right, Mr. Petrovich, what's your response to the

15   proposal to excuse Mr. Benningfield?

16           MR. PETROVICH:  Your Honor, I would ask the Court

17   just for some leeway to hear how the testimony comes out today.

18   It could be that we don't need him or want to use him.  But I

19   need to first see how some of testimony comes out that we

20   anticipate coming today.  If the Court would give me until

21   tomorrow morning.  I think the Government can give him notice

22   in time not to expend the Government's resources in that

23   regard.

24           THE COURT:  Okay, all right.  How would you expect to

25   use him if you need to?  Based on Honduran slang of Spanish

6

1    words?

2              MR. PETROVICH:  The interpretation of certain words,

3    that's correct, Your Honor.

4              THE COURT:  All right.  Well, then let's see how

5    today goes.  I will ask you at the end of the day where you

6    are.

7              MR. PETROVICH:  Very well, Your Honor.

8              THE COURT:  All right.

9              MR. PETROVICH:  And we don't object to Mr. Aminoff,

10   we saw the exhibits, there is no objection there.

11             THE COURT:  All right, no objection to the PowerPoint

12   exhibits.

13             All right, Mr. Trump, then voir dire questions.

14             MR. TRUMP:  Yes, Your Honor.  The only two that we

15   proposed other than the Court's standard voir dire was the one

16   in the memorandum regarding the fact that the defendant and

17   many of the witnesses are from Honduras.

18             The second one is that I believe all but one witness

19   will be testifying through the use of an interpreter.  I think

20   the Court should inquire whether that fact presents any issues

21   for potential jurors.

22             And also whether any potential jurors are fluent in

23   Spanish because I believe the Court would instruct them that

24   the record in the case is what the interpreters translate into

25   English, not what an individual juror might think is the

1    appropriate translation of that testimony.

2            So those are the two that we would suggest in

3    addition to the Court's standard voir dire.

4            I think that the suggested voir dire by the defense

5    is unnecessary in large part.  A simple question on the topics,

6    whether anyone has any bias or personal feelings regarding a

7    particular topic would prevent them from fairly and impartially

8    judging the facts and applying the law in the case would be

9    sufficient.

10           If follow-up questions are necessary, that's

11   certainly subject to the discretion of the Court.  But to be

12   more intrusive as to whether somebody owns guns, for example, I

13   think is unnecessary.

14           THE COURT:  Okay.  What is the expected testimony

15   about Guzman, El Chapo?

16           MR. TRUMP:  I am not sure what the defense

17   anticipates.  My recollection in terms of pretrial preparation,

18   there would be testimony by one witness that a cousin of Chapo,

19   a guy by the name of Wanita Guzman, had a conversation with the

20   witness concerning the defendant, but we weren't intending to

21   elicit that it was a cousin of El Chapo.

22           THE COURT:  So there isn't going to be any testimony

23   that the drugs in this case were being sent up to be controlled

24   by El Chapo in Mexico for further --

25           MR. TRUMP:  Well, they are controlled by the Mexican

8

1    cartels, including the Sinaloa Cartel, that's a fact.  And

2    Government's burden is to show that the drugs went from

3    Colombia to Honduras, through Guatemala, Mexico, and eventually

4    into the United States.

5            So the Mexican cartels do receive these drugs, but we

6    don't intend to elicit specific testimony that this defendant

7    had a personal relationship with El Chapo.

8            Now, if, out of an abundance of caution, they want to

9    tell the jury that their defendant has some relationship with

10   El Chapo, that's fine with us, but I don't think it's

11   appropriate at this point to make that inquiry.

12           THE COURT:  In voir dire?

13           MR. TRUMP:  In voir dire.

14           THE COURT:  Okay.

15           MR. TRUMP:  But as I said in our memo, we leave that

16   to their choice, but I'm just advising the Court that we don't

17   intend to elicit anything about El Chapo specifically.  But we

18   do intend to elicit that the drugs eventually found their way

19   into the hands of the Mexican cartels, including the Sinaloa

20   Cartel.  And there will be the mention of a Guzman, who is a

21   cousin of Chapo, but I don't expect the witness to blurt out

22   that it was El Chapo's cousin.

23           THE COURT:  Okay.  Thank you.

24           Mr. Petrovich.

25           MR. PETROVICH:  Yes, Your Honor.  I think the

9

1    questions proposed with regard to our voir dire suggestions are

2    basic voir dire.

3            I'll touch base first on the issue with regard to El

4    Chapo.  I think it's very important, it's absolutely necessary

5    for a Court to delve into the thoughts of jurors with regard to

6    current events.  The El Chapo trial is current and ongoing.  It

7    has been in the news extensively.  It represents Mexican drug

8    trafficking.  People have heard many things over many

9    broadcasts in different forums with regard to drugs and Mexico.

10           The Government's case will for sure emphasize that

11   Mexico was a vital part of this alleged conspiracy.  And in

12   that regard, it's imperative that we know if a juror has

13   already established in their minds, well, this is another drug

14   case and somewhere south of the U.S. in Central or South

15   America and we need to just find them guilty and lock these

16   people up.  That's an absolutely necessary part of the voir

17   dire, to make sure that they are impartial.

18           I think the Government phrased it perfectly.  The

19   Government is not going to allege that Mr. Maximo was involved

20   or had any direct dealings with El Chapo or the Sinaloa Cartel;

21   however, the allegations do claim that he was involved in a

22   conspiracy that eventually involved moving drugs through Mexico

23   in that cartel.  Do any of you feel that that would create any

24   bias in your minds with regard to Mr. Fagot-Maximo's

25   presumption of innocence?

10

1              And it needs to be delved into.

2              THE COURT:  The question is, are you going to delve

3    into it, El Chapo specifically?

4              MR. PETROVICH:  No, Your Honor.

5              THE COURT:  Okay.  I'm just trying to -- I'll ask a

6    question whether anybody has been following a drug trial in New

7    York where there is an individual named El Chapo and if that --

8    if they could put that aside.  But I'm just curious as to how

9    far you intend to go.

10              MR. PETROVICH:  I don't intend to mention -- no, we

11    don't intent to delve into that area at all.

12              THE COURT:  All right, then I'll ask the question.

13    Go ahead.

14              MR. PETROVICH:  Your Honor, I would also note, again

15    in regards to the current events, the questions we proposed

16    with regard to nationality --

17              THE COURT:  I'm going to ask those questions.

18              MR. PETROVICH:  Very well.

19              THE COURT:  And I will give you -- I'm going to go

20    through the voir dire, I'll ask most of the questions,

21    including the questions regarding that this case involves

22    violence and narcotics and firearms and violent crimes.  And

23    I'm not going to ask it the way you propose, but I will

24    generally ask it.  I think it's a standard question that I ask

25    in each case.  And we will do those at sidebar.

11

1              And to the extent you have additional questions you

2    want me to ask, you listen carefully and see what you I think

3    I've left out, and we'll talk about it at sidebar.

4              MR. PETROVICH:  Very well, Your Honor.

5              THE COURT:  Okay.  All right.

6              MR. TRUMP:  Just one minor point, Judge.  For

7    example, there is one proposed question that states a fact that

8    would otherwise not be in evidence, and I think that's

9    inappropriate.

10             For example, one of their questions says:  The

11   defendant has never been to the United States.

12             Well, that's -- who knows.  I don't know if he has

13   ever been to the United States.

14             So I don't think any voir dire question should assume

15   facts that may or may not be in evidence.  And that's why the

16   general questions, as you suggest, are the appropriate ones,

17   not ones that kind of front trial facts to the jury.

18             THE COURT:  Yeah.  I understood, and I agree.  But I

19   will ask about whether there is any particular bias to Honduras

20   given the number of witnesses that I understand are going to be

21   from Honduras.

22             And I will ask the additional questions regarding the

23   use of the interpreters.  Also, if anyone is fluent in Spanish.

24             All right.  Then any comments on the selection?  When

25   we were together last I suggested that we would call 12 -- we

12

1    would get 12 in the box, and then call four additional jurors

2    and have each side strike one of those jurors, and those would

3    be the alternates.

4              Is there any objection to that?

5              MR. TRAXLER:  No objection from the Government, Your

6    Honor.

7              THE COURT:  Mr. Petrovich?

8              MR. PETROVICH:  No, sir.

9              THE COURT:  Okay.  All right, anything else then

10   before we --

11             MR. TRUMP:  Your Honor --

12             MR. PETROVICH:  Your Honor, just to clarify -- I'm

13   sorry, go ahead.

14             MR. TRUMP:  The request I had made previously that

15   you advise the jury that I had no relationship with the other

16   Trump.

17             THE COURT:  Okay.

18             MR. WALSH:  I don't know if we need to ask that.

19             THE COURT:  Well, since Judge Ellis gave it in the

20   middle of the Manafort case when Mr. Trump merely came into the

21   courtroom, it obviously is something that draws interest.  And

22   certainly I will let them know.

23             MR. PETROVICH:  Your Honor, I don't think there is

24   any reason for that.  Again, that's a fact that is not going to

25   be in evidence, and that's what Mr. Trump --

13

1          THE COURT:  All right.  Anything substantive you want

2    to talk to me about?

3          MR. PETROVICH:  We wanted to clarify, it's the

4    defense -- the defense gets ten strikes and the Government gets

5    the six strikes.  We just want to make sure.  We haven't

6    discussed that.

7          THE COURT:  Yeah.

8          MR. PETROVICH:  We got together after our last court

9    appearance and went over that a little bit, but we just want to

10   make sure we are all on the same page in that regard.

11         THE COURT:  Okay, yeah.  There hasn't been any

12   request for additional strikes, and I will allow the

13   traditional numbers.

14         Okay.  Anybody identify anybody right off the bat on

15   the jury list?  Have you had the opportunity to do that?

16         MR. PETROVICH:  Your Honor, just one thing, I

17   apologize.

18         THE COURT:  Yes, sir.

19         MR. PETROVICH:  Mr. Walsh and I didn't get together

20   on this.  Really, we would ask for ten, plus the one additional

21   for the alternates.

22         THE COURT:  Yes, absolutely.

23         MR. PETROVICH:  Very well.  Thank you, Your Honor.

24         THE COURT:  Put the 12 in the box, using all the

25   strikes you need if you need them.  And then the additional one

14

1    for the alternates.

2              MR. PETROVICH:  Thank you, Your Honor.

3              THE COURT:  Yes.

4              INTERPRETER LEFEBVRE:  Your Honor, we have another

5    interpreter.  Sorry for the interpretation.

6              THE COURT:  Yes.  We have both.  Ms. Horvath has just

7    come in as well.  Let's swear our additional interpreters now.

8              NOTE:  The interpreters are sworn.

9              INTERPRETER HORVATH:  For the record, Maria Horvath,

10   federally certified court interpreter.  Good morning.

11             INTERPRETER GASTON:  For the record, Erin Gaston,

12   also a federally certified interpreter.

13             THE COURT:  All right, good morning to both of you.

14   And thank you for serving with us.

15             And the Government has asked that Special Agent Kelly

16   be allowed to remain at counsel table.  Is there any objection

17   to that?

18             MR. PETROVICH:  No objection, Your Honor.

19             THE COURT:  Okay.  All right.  Then let's take a

20   brief recess while we get our jury upstairs, and we will come

21   back and we will begin our jury selection process.

22             All right, we're in recess.

23             NOTE:  At this point a recess is taken; at the

24   conclusion of which the case continues in the presence of the

25   jury panel as follows:

15

1    JURY PANEL IN

2              THE CLERK:  The Court calls case 1:15-cr-290, the

3    United States of America versus Arnulfo Fagot-Maximo for a jury

4    trial.

5              May I have the appearances, please, first for the

6    Government.

7              MR. TRUMP:  Your Honor, Jim Trump on behalf of the

8    United States, with Tommy Traxler and Anthony Aminoff.

9              THE COURT:  All right, good morning to each of you.

10             MR. PETROVICH:  Good morning, Your Honor.  Mark

11   Petrovich on behalf of Mr. Fagot-Maximo, along with co-counsel

12   Thomas Walsh.

13             THE COURT:  All right, good morning to each of you.

14             Good morning, ladies and gentlemen.  My name is Liam

15   O'Grady, and I'll be the judge handling this case.  It's a

16   criminal case, and I'll give you a little more information

17   about it in a few minutes.  But let's first call the roll and

18   see who is here this morning.

19             THE CLERK:  Good morning, ladies and gentlemen.  As I

20   call your name, would you please stand, answer present, and you

21   may be seated once your name is called.  I apologize in advance

22   if I mispronounce any names.

23             NOTE:  The jury panel is called and sworn.

24             THE COURT:  All right, thank you.  Good morning

25   again.

16

1              As I said, this is a criminal case, the United States

2    versus Arnulfo Fagot-Maximo.  Mr. Fagot-Maximo is charged with

3    one count of conspiracy to distribute five kilograms or more of

4    cocaine, intending it to be imported into the United States, in

5    violation of Title 21, Section 959 and 963.

6              He's charged with conspiring with other individuals,

7    including several members of the Bobadilla family, Noe

8    Bobadilla, Erlinda Bobadilla, Alejandro Bobadilla, Juan Carlos

9    Bobadilla, and Jose Garcia-Teruel, between the years 2006 and

10   2015.

11             It is alleged in the indictment that the defendant

12   was a part of the Bobadilla and other drug trafficking

13   organizations that ordered a large quantity of cocaine from

14   Colombia, South America, for delivery by boat or plane to

15   Honduras.  And that Mr. Fagot-Maximo is alleged to have

16   controlled a property on the coast of Honduras where the

17   cocaine from Colombia was off-loaded before being transferred

18   to the Bobadilla or other drug trafficking organizations,

19   including the Valle drug trafficking organization, for further

20   distribution to Mexico and to the United States.

21             So that's a very thumbnail sketch of what the charges

22   are.  Mr. Fagot-Maximo has pled not guilty to those charges,

23   and that is the reason that you are here today, is to take part

24   in the jury selection, and the jury will hear evidence and

25   determine his guilt or innocence through our trial-by-jury

17

1   system.

2         As I indicated, my name is Liam O'Grady.  And I'll be

3   assisted by a wonderful staff here that will try and keep me on

4   schedule and doing things I ought to be doing to assist in

5   helping us through our trial together.

6         I'm going to begin asking a series of questions, it's

7   called voir dire or voir dire depending upon what TV show you

8   listen to, but it's a way to assist the counsel in the case in

9   assembling what they think are the best jurors to hear this

10  type of case.  There is no scientific formula here, it's just

11  their best belief in who would best be served sitting on this

12  jury.

13        As I said, I'll be asking a series of questions.  If

14  your answer is "yes" to any of those questions, then I'll ask

15  you to stand up, please give us your name each time.  And also,

16  if you remember your jury number, give us your jury number as

17  that will assist us in keeping track of the answers to my

18  questions.

19        As you heard briefly, the United States is

20  represented by Mr. Trump, Mr. Traxler, and Mr. Aminoff.

21        Mr. Trump, if you would identify the remaining

22  members of your team at this time, or Mr. Traxler.

23        Please listen carefully to the names.

24        And also identify the names of the witnesses that you

25  expect to call during your case in chief.

18

```
1            MR. TRUMP:  Thank you, Your Honor.  Heather Lee.
2   Mary Vargas.  Lieutenant E.J. Kelly of the Virginia State
3   Police.
4            The witnesses that the Government expects to call
5   are:  Special Agent Gregg Mervis of the Drug Enforcement
6   Administration.  Luis Gaviria.  Anderson Lever.  Richard
7   Mosquera.  Miguel Arnulfo Valle Valle.  Luis Alonso Valle
8   Valle.  Alexander Suazo Peralta.  Devis Leonel Rivera
9   Maradiaga, also known as Leo Cachiro.  Jose Manuel Lopez
10  Morales.  Fernando Chang Monroy.  Ronald Joel Carrion
11  Zalabarria.  And last, Task Force Officer Edmund J. Kelly.
12           THE COURT:  Thank you.  Do any of you recognize any
13  of the names that Mr. Trump has just gone over with you?  All
14  right.
15           Mr. Trump, by the way, is not related to anybody in
16  the White House or family members.  I don't want you to be
17  curious about that.
18           Do any of you have any business dealings or personal
19  relationships with any of the Assistant U.S. Attorney's here in
20  the courtroom or the U.S. Attorney's Office here in the Eastern
21  District of Virginia in Alexandria?
22           All right.  Any of you -- yes, ma'am.
23           JUROR ████:  54, ██████████  I believe the
24  U.S. District Attorney's son goes to the preschool that I'm
25  head of school at.  I know the family.
```

19

```
1            THE COURT:  All right.  And the -- I'm sorry.
2            JUROR ███████:  ████████████  is the son.
3            THE COURT:  ██████████.  All right.  And do you have
4   a personal relationship with him, or you just know that he is
5   one of --
6            JUROR ██████:  I know his wife better than him.  And
7   I know his son quite well.
8            THE COURT:  Okay.  And any reason why that would make
9   it difficult for you to be fair and impartial here?
10           JUROR █████:  No.
11           THE COURT:  All right.  Thank you, very much.
12           Anybody else?  Anybody have any business relationship
13   with the U.S. Attorney's Office, work that you do for them?
14           Are any of you familiar with Special Agent Kelly, who
15   is the case agent, from DEA in the case?  All right, thank you.
16           As you also heard, the defendant is represented by
17   Mr. Petrovich and Mr. Walsh.  They have a firm in Fairfax,
18   Virginia, Petrovich & Walsh.  Do any of you know either of Mr.
19   Petrovich or Mr. Walsh, or had any personal or business
20   dealings with them?
21           Do any of you know Mr. Fagot-Maximo?
22           All right.  Mr. Petrovich, if you would identify your
23   law clerk one more time for -- this is Mr. Fagot-Maximo.  Thank
24   you, Mr. Petrovich.
25           And your law clerk, sir, who is helping you today.
```

20

1          MR. PETROVICH:  Yes.  Good morning, Your Honor.

2     Ladies and gentlemen, this is Baabak Zarrabian, he's our law

3     clerk, and he'll be assisting us with regard to the trial in

4     the case.

5          THE COURT:  All right.  The defendant is not required

6     to call any witnesses, as I will explain a little further.  The

7     burden is always on the Government to prove the case beyond a

8     reasonable doubt and the defendant has no burden.

9          But, Mr. Petrovich, at this time do you have any

10    witnesses that you want to identify that you're certain to

11    call?

12         MR. PETROVICH:  At this time we will be relying on

13    the same witnesses, Your Honor.

14         THE COURT:  All right, thank you.

15         Do any of you know Mr. Petrovich's law clerk?  All

16    right.

17         The case, ladies and gentlemen, is expected to last

18    until the middle of next week.  But for purposes of being

19    overly cautious, I'll ask whether you have any conflicts in

20    serving on the jury between today and the end of next week?

21         If I excused everybody who said it was just

22    inconvenient to be a juror, then we would have no jury trials.

23    And, of course, our system of justice is the best in the world

24    because you come and give your time and attention and make the

25    difficult decisions that every jury makes in our nation.

21

1          So I'm only able to excuse jurors with specific

2     conflicts, and they would include:  Single parents who have no

3     daycare at home.  Sole proprietors whose businesses are

4     shuttered if they are not at their place of work.  Students who

5     have classes during the day.  Those with a paid business trip

6     that can't be rearranged.  Those with a prepaid vacation trip

7     which can't be rearranged.  Also, those with medical

8     appointments that cannot be rescheduled.

9          So if you fit into one of those categories, I'll hear

10    from you now.  Anybody on the left-hand side?  Yes, ma'am.

11          JUROR �â– :  I do have a prepaid trip.

12          THE COURT:  I'm sorry?  Is it --

13          JUROR ▄:  71, ▄▄▄▄▄.

14          THE COURT:  Yes, and you are 71.

15          JUROR ▄:  Correct.

16          THE COURT:  All right.  What's your conflict?

17          JUROR ▄:  So we have a family trip to New York,

18    all arrangements are made.  But it wouldn't be a problem if I

19    would not have to bring the kids.  My husband is flying on a

20    business trip, and I have to deliver the kids to New York.

21    Even if I have to come back here, I would have to transfer the

22    kids to New York.

23          THE COURT:  Okay.  I'm catching about half of what

24    you're saying.  You need to speak up for me.  What do you --

25    you have a business --

22

1           JUROR ▮▮▮▮: So we have a family trip to New York.

2           THE COURT: And your husband is joining you there?

3           JUROR ▮▮▮▮: And my husband is flying in. I will

4     have to bring the kids because the whole trip is already

5     prepaid.

6           THE COURT: Okay. And does it -- is it on the

7     weekend? Or does it conflict --

8           JUROR ▮▮▮▮: It's actually Monday through Wednesday.

9           THE COURT: Of next week?

10          JUROR ▮▮▮▮: Yes.

11          THE COURT: Okay, all right. Thank you, ▮▮▮▮▮.

12          Anybody else on the left-hand side?

13          All right, let's go to the middle then. Anybody in

14    the middle have a conflict that can't be rescheduled? Yes,

15    ma'am.

16          JUROR ▮▮▮▮▮▮▮: Hi. I work a typical 9-to-5

17    job, and then I also own my dog training business that I do in

18    the evenings. Sorry, number 17, ▮▮▮▮▮▮▮▮.

19          THE COURT: Okay. You have a side business in the

20    evening after you work during the day?

21          JUROR ▮▮▮▮▮▮▮: Yes.

22          THE COURT: And that's a sole -- you run that on your

23    own; is that correct?

24          JUROR ▮▮▮▮▮▮▮: I do, yes.

25          THE COURT: All right. And how many hours a week do

23

1   you work on that business?

2          JUROR ████████████:  I currently have right now 15

3   active clients that I do throughout the evenings and on the

4   weekends as well.

5          THE COURT:  Okay.  All right, thank you.

6          JUROR ████████████:  Thank you.

7          THE COURT:  Yes, ma'am, go ahead.

8          JUROR ██████:  54, ████████████.  I'm an Episcopal

9   priest, and I have services between now and next week.

10  Certainly on the weekends, but I also have two services

11  tomorrow.  I can postpone them, but then there are people who

12  don't get the services.

13         THE COURT:  What kind of services again?

14         JUROR ██████:  Worship services, associated

15  church-related services.

16         THE COURT:  All right.  Thank you, ████████.

17         Yes, sir.

18         JUROR ██████:  Hi.  I'm number 19, ████████████.

19  I have a business meeting that was planned for Monday afternoon

20  in Florida.

21         THE COURT:  All right.  And that can't be

22  rescheduled, ████████████?

23         JUROR ██████:  No.  One of people is flying in from

24  overseas to attend that meeting.

25         THE COURT:  Okay, all right.  Thank you, sir.

24

1          Anybody else in the middle?  Yes, ma'am.

2              JUROR ████: Hi.  Number 34, ██████████.  My

3    husband is law enforcement and he works a night shift job, so

4    I'm the main person who gets the kids to school, after school,

5    and takes care of them.

6              THE COURT:  All right.  And they don't have any after

7    school care, is that --

8              JUROR ████: No, it's myself.

9              THE COURT:  So what time do you have to get them, ████

10   ████?

11             JUROR LANGER:  4 o'clock.

12             THE COURT:  Okay.  Thank you, ██████████.

13             Anybody else in the middle?  Yes, ma'am.

14             JUROR ██████: Hi.  Number 60, ████████████.  I am

15   a stay-at-home mom.  I do have child care set up until Thursday

16   or Friday of next week.  So I think you said Friday for sure.

17   I would do my best to have it covered, but I just am uncertain

18   right now.

19             THE COURT:  Okay.  All right.  Thank you, ████████.

20             All right.  Anybody on the far side?

21             JUROR ████: 53, ██████████████  I am currently

22   working out of state, I have been for three months, and I'm

23   still scheduled to work out of state for another four weeks,

24   Eastern Maryland.  The company has already paid for the hotel

25   and everything, so --  I came back for this.

25

```
 1              THE COURT:  You're working with a team of people out
 2    there?
 3              JUROR ███████:  Yeah.  I am the project manager for a
 4    construction site.
 5              THE COURT:  All right.  You don't think they can do
 6    without you for a couple --
 7              JUROR ███████:  I hope not.  It's just already paid
 8    for, it's the company's loss for two weeks of me not being
 9    there.
10              THE COURT:  All right.  Thank you, ████████.
11              Yes, sir.
12              JUROR ███████:  Number 67, ████████.  Defense
13    contractor, and we have a trip for one of my projects Monday
14    through Thursday of next week to Michigan and then to San
15    Diego.
16              THE COURT:  Okay.  Who do you work with, ████████?
17              JUROR ███████:  So my company is ManTech
18    International, but I work for the Marine Corps.
19              THE COURT:  All right.  And that can't be rescheduled
20    or somebody else can't go in your stead?
21              JUROR ███████   No, sir.
22              THE COURT:  All right.  Thank you, ████████.
23              All right.  Anybody in -- yes, sir.
24              JUROR ████:  Number 24, ████████.  I have a trip
25    to Florida about six --
```

26

1          THE COURT REPORTER:  I'm sorry, you are going to have

2     to speak a --

3          THE COURT:  Yeah.  This is number 24, ███████.  And

4     speak up, please, sir.

5          JUROR ███:  Yeah, I have a trip to Florida next week

6     from Monday through Friday, I'm taking the continuing

7     education.  I'm a civil engineer.

8          THE COURT:  I didn't hear the last part of what you

9     said.  You're taking a course down there?

10          JUROR ███:  Yes, it is continuing education credits

11     for my license.

12          THE COURT:  What type of license was that?

13          JUROR ███:  I'm a civil engineer, professional

14     engineer.

15          THE COURT:  All right.  Thank you, sir.

16          Anybody else?  All right, ███████.

17          JUROR ███:  Number 30, ████████.  I have a doctor's

18     appointment Wednesday morning, this Wednesday morning.  It is

19     hard to reschedule.  I have already done the blood tests and

20     everything.

21          THE COURT:  I'm sorry, you're having some blood work

22     done, is that what you --

23          JUROR ███:  I have already had it done, and it will

24     be hard to reschedule that appointment.

25          THE COURT:  Okay.  Thank you, ███████.

27

1          Yes, sir.

2          JUROR [REDACTED]:  Number 7, [REDACTED].  I'm the sole

3  used car mechanic at the dealership in Leesburg.  I already

4  have two vehicles already ripped apart, the dashboards and

5  seats have come apart, for a couple of sold vehicles.  Also, I

6  have a backlog of vehicles.  It would substantially be a

7  detriment to my employer if I was to be out for that long of a

8  period of time.  I'm also one of only two emissions inspectors

9  there.

10          THE COURT:  All right.  Thank you, [REDACTED].

11          Yes, ma'am, in the middle.  Yes.

12          JUROR [REDACTED]  This is out of an abundance of

13  caution.  Sorry, number 36, [REDACTED].

14          THE COURT:  Yes.

15          JUROR [REDACTED]:  I have a flight out of the country

16  on December 12.  So I know it is through next week, but just in

17  case it goes over, I wanted to put that on the radar.

18          THE COURT:  All right.  Thank you, [REDACTED].

19          Yes, sir, in the back.

20          JUROR [REDACTED]:  Number 55, [REDACTED].  I'm a

21  night auditor at a hotel, and I work from 11 to 7.  And I am

22  the only night auditor throughout the entire week.  It's just a

23  little inconvenient to be sleep deprived the entire week.

24          THE COURT:  There is nobody else that teams with you,

25  [REDACTED]?

28

1      JUROR ▮▮▮▮▮▮▮:  No, sir.

2      THE COURT:  All right.  Thank you, sir.

3      Anybody else?  Yes, ma'am.

4      JUROR ▮▮▮▮▮▮▮:  Hi.  I am number 52, ▮▮▮▮▮

5      ▮▮▮▮▮▮▮.  I am an eighth grade teacher preparing right

6   now report cards for end of the trimester.  I also have a

7   proctored exam, high school placement exam on Thursday.

8      THE COURT:  Say that again, the last part.

9      JUROR ▮▮▮▮▮▮▮:  High school placement exam, I

10  am a proctor for that exam on Thursday.

11     THE COURT:  For the students, the eighth-graders, for

12  placement testing?

13     JUROR ▮▮▮▮▮▮▮:  Yes.

14     THE COURT:  Okay, thank you.

15     Mr. ▮▮▮▮▮, you raised your hand, sir?

16     JUROR ▮▮▮▮▮▮▮:  I am number 1, my name is

17  ▮▮▮▮▮▮▮▮▮.  And I have a final exam this Thursday.

18     THE COURT:  Okay.  Where are you going to school?

19     JUROR ▮▮▮▮▮▮▮:  Northern Virginia Community

20  College.

21     THE COURT:  And you have an exam during the day this

22  Thursday?

23     JUROR ▮▮▮▮▮▮▮:  No, it is 6 o'clock p.m.

24     THE COURT:  6 o'clock p.m.?

25     JUROR ▮▮▮▮▮▮▮:  Yes.

29

1      THE COURT:  All right.  Thank you, sir.

2      Anybody else?  Does anybody have a language

3  difficulty, understanding the English language?  Or have any

4  vision issues, or hearing issues, or any other medical reason

5  why you believe that you would not be able to understand or sit

6  through trial?

7      JUROR ███:  58.  I just have a quick question.  I

8  have had two spinal fusions, so I have to stand up every once

9  in awhile.  As long as we can do that --

10     THE COURT:  Yeah, absolutely, you will be permitted

11  to do that.

12     We also have hearing aids for those who may have a

13  little difficulty in the courtroom that can be worn during the

14  course of the trial.

15     All right, anybody else?  Yes, sir.

16     JUROR ███:  56, ████████████.  My English is

17  limited.  My language is -- I can't understand properly.  But

18  somebody explaining --

19     THE COURT:  Yeah.  I mean, have you had difficulty

20  understanding the questions I've been asking so far, ███

21  ███?

22     JUROR ███:  Yes, sir.

23     THE COURT:  All right.  How long have you been

24  speaking English?

25     JUROR ███:  I have been here for a long time, but

30

1   my job allows limited language.  It's limited, my English.

2          THE COURT:  All right.  Thank you, ███████.

3          JUROR ████: ████.

4          THE COURT:  Oh, you're ██████. ████.  I'm sorry,

5   I heard 66, but you're 56.  All right.

6          Have any of you received any information about this

7   case -- I don't think it's received any publicly.  But in any

8   other means?  All right.

9          Have any of you served as jurors previously either in

10  a criminal or a civil case, or as a member of a grand jury

11  either here in federal or state court in Virginia or elsewhere?

12          And if we can start on the side again.  Yes, ma'am.

13          JUROR ██████: 72, ██████████ I lived in

14  D.C., and so I have served in a trial there when I first moved

15  here in like '90, '91.

16          THE COURT:  All right.  Was it a criminal or a civil

17  case, █████████?

18          JUROR ██████: Criminal.

19          THE COURT:  All right.  And was the jury able to

20  reach a verdict in the case?

21          JUROR ██████: Yeah.  But it was a long time ago,

22  so I don't really remember.

23          THE COURT:  All right.  So it doesn't present any

24  difficulties from that case for you sitting in this case, is

25  that fair to say?

31

1          JUROR ▆▆▆▆▆▆: Yes.

2          THE COURT: All right. Thank you, ▆▆▆▆▆▆▆▆.

3          Anybody else on the far side?

4          How about in the middle then? Anybody in the middle?

5   Yes, sir, in the front row.

6          JUROR ▆▆▆: Number 9, ▆▆▆▆▆▆▆▆. I was on a

7   state jury, I can't even remember how long ago, maybe 20,

8   25 years ago.

9          THE COURT: All right.

10          JUROR ▆▆▆: They sat the jury, and then they put us

11   back in a room, and it was settled and we didn't even go to

12   trial.

13          THE COURT: All right. Any reason why that would

14   make it difficult for you to be fair and impartial in this

15   case, ▆▆▆▆▆▆?

16          JUROR ▆▆▆: No, sir.

17          THE COURT: All right, thank you.

18          All right. Yes, ma'am, in the front row.

19          JUROR ▆▆▆: 33, ▆▆▆▆▆▆▆▆. I served on a jury

20   in a criminal case about 1980 in Rockville, Maryland,

21   Montgomery County court.

22          THE COURT: And was the jury able to reach a verdict

23   in that case?

24          JUROR ▆▆▆: Yes, sir.

25          THE COURT: All right. And any issues presented

1  there which would make it difficult for you to sit here, █████

2  ██?

3          JUROR ████:  No, sir.

4          THE COURT:  Thank you.

5          All right.  Anybody else in the middle?  Yes, sir.

6          JUROR █████:  Number 22, █████████.  In '96 I

7  served in the Southern District of New York.  I was an

8  alternate, so I did not go through the entire trial.

9          And then in 2011 I served on a County of Arlington

10  criminal case.

11          THE COURT:  All right.  And what kind of case was it

12  in Arlington?

13          JUROR █████:  It was criminal case, and we were

14  hung.

15          THE COURT:  And the jury hung up?

16          JUROR █████:  Correct.

17          THE COURT:  All right.  And anything about those

18  experiences which would make it difficult for you to be fair

19  and impartial in this case, ██████████?

20          JUROR ████:  No.

21          THE COURT:  All right, thank you.

22          Anybody else in the middle?  Yes, ma'am.

23          JUROR ████:  Number 57, ████████.  I was a

24  juror in Fauquier County a few years ago in a criminal case.

25  We had not come to a decision, but the individual pled guilty

33

1    before we went back into the courtroom.

2            THE COURT:  Okay.  And where was that?  I'm sorry.

3            JUROR ▇▇▇▇:  Fauquier County.

4            THE COURT:  In Fauquier County.  All right.  And any

5    reason why that experience would make it difficult for you to

6    be fair and impartial here?

7            JUROR ▇▇▇▇:  No, sir.

8            THE COURT:  All right, thank you.

9            Yes, ma'am.

10           JUROR ▇▇▇▇:  Number 16, ▇▇▇▇▇▇▇▇.  Two criminal

11   cases, Rockingham County mid '90s.

12           THE COURT:  I'm sorry, when?

13           JUROR ▇▇▇▇:  In the mid '90s.

14           THE COURT:  In the mid '90s.  And was the jury in

15   each of those cases able to reach a verdict?

16           JUROR ▇▇▇▇:  Yes, sir.

17           THE COURT:  And anything about that experience which

18   would make it difficult for you to be fair and impartial here,

19   Ms. Estep?

20           JUROR ▇▇▇▇:  No.

21           THE COURT:  Thank you.

22           Anybody else in the middle?  Yes, sir, in the back.

23           JUROR ▇▇▇▇▇:  62, ▇▇▇▇▇▇▇.  I served, it was

24   in Fauquier County as well, criminal case, insurance fraud.

25           THE COURT:  All right.  And how long ago was it, ▇▇▇

34

1    ███ ?

2         JUROR ███████: It was a long time ago.

3         THE COURT: All right. Is there any reason why --

4         JUROR ███████: I can't remember the exact date.

5         THE COURT: I'm sorry?

6         JUROR ███████: I can't remember the exact date, but

7    it was a long while ago.

8         THE COURT: All right. Were you able to reach a

9    verdict in the case?

10        JUROR ███████: Yes, we did.

11        THE COURT: And any reason why that experience would

12   make it difficult for you to be fair and impartial here?

13        JUROR ███████: No, sir.

14        THE COURT: All right. Thank you, ██████████.

15        All right, far side. Yes, ma'am.

16        JUROR ███████: Number 63, █████████████. About six

17   years ago in New York City I served on a civil case, and we

18   reached a verdict.

19        THE COURT: All right.

20        JUROR ███████: And then several years back, I can't

21   remember how long before that, also civil.

22        THE COURT: Okay. And any reason why those

23   experiences would make it difficult for you to be fair and

24   impartial here?

25        JUROR ███████: No, sir.

35

1           THE COURT:  All right.  Thank you, ███████.

2           Yes, sir.

3           JUROR ████:  Number 67, ████████.

4           THE COURT:  Right.

5           JUROR ████:  In early 2000, Fauquier County court,

6      it was a civil case.

7           THE COURT:  All right.  Were you able to reach a

8      verdict?

9           JUROR ████:  Yes, sir.

10          THE COURT:  Any reason why that would make it

11     difficult for you to be fair and impartial here, sir?

12          JUROR ████:  No, sir.

13          THE COURT:  All right, thank you.

14          All right.  Anybody else?  Oh, okay.  All right, in

15     the back, please.

16          JUROR ████:  Number 11, ████████.  I was on a

17     criminal case in Fairfax County about ten years ago.

18          THE COURT:  All right.  And were you able to reach a

19     verdict in the case, ████████?

20          JUROR ████:  The judge declared a mistrial, so there

21     was no verdict.

22          THE COURT:  All right.  And anything about that

23     experience which would make it difficult for you to be fair and

24     impartial here?

25          JUROR ████:  No, sir.

36

1          THE COURT:  All right, thank you.

2          All right, there was another hand.  Yes, sir.

3          JUROR ▇▇▇:  Number 14, ▇▇▇▇▇▇▇.  I served on a

4   criminal case in Michigan state probably in the early '80s, and

5   we came to a verdict.

6          THE COURT:  You were able to come to a verdict, is

7   that what --

8          JUROR ▇▇▇:  Yes, sir.

9          THE COURT:  All right.  And any reason why that would

10  make it difficult for you to be fair and impartial in this

11  case, ▇▇▇▇▇?

12         JUROR ▇▇▇:  No, sir.

13         THE COURT:  All right, thank you.

14         JUROR ▇▇▇:  In response to one of the previous

15  questions, I have had four operations on my eyes, so I have

16  limited vision.  But I don't think that would be a problem.  I

17  can see you.

18         THE COURT:  Okay.  Well, I have spent a year wearing

19  a patch myself and driving a motorcycle around, and I scared

20  people beyond belief.  But your depth perception --

21         JUROR ▇▇▇:  I am not currently driving.

22         THE COURT:  All right.  Well, if you have any

23  difficulty -- if you're seated on the jury and you have any

24  difficulty, here we just raise our hand.  And if a witness

25  needs to repeat something that they've said already, or for

37

1  other reasons, do you think that would take care of it, the

2  issue, █████████?

3          JUROR ████:  Certainly.

4          THE COURT:  All right, thank you.

5          All right, did I see another hand?  Yes, sir.

6          JUROR █████:  46, █████████.  I served in about

7  2010 on a criminal case in Loudoun County Circuit Court.  It

8  was a jury case, it was an acquittal.

9          THE COURT:  Okay.  And, █████████, any reason why

10 that experience would make it difficult for you to be fair and

11 impartial in this case?

12         JUROR ████:  No.

13         THE COURT:  All right, thank you.

14         All right.  Anybody else?

15         All right.  Here is a multipart question for you, so,

16 please, listen.  And if you answer yes to any of these

17 multiparts, please let me know.

18         Have you or any member of your family or any close

19 friend been employed by:  A, a law enforcement agency; B, a

20 prosecutor's office; C, a forensic scientist; D, a correctional

21 officer; E, a security officer; F, a drug treatment counselor;

22 or, G, a firearms dealer?

23         Do you want me to repeat that one more time?  Okay.

24 Law enforcement agency.  Prosecutor's office.  Forensic

25 scientist.  Correctional officer.  A security officer.  A drug

38

1    treatment counselor.  Or a firearms dealer.  You, any member of

2    your family, or a close friend been employed.

3           Let's start on the side.  ███████████.

4           JUROR ███████:  My sister-in-law is an attorney, she

5    works -- I know she works, Your Honor, for D.C. in the

6    Immigration Department.

7           THE COURT:  I'm sorry, say that last part again.

8           JUROR ███████:  She is an assistant lawyer, she is an

9    attorney.

10          THE COURT:  71.

11          JUROR ███████:  She works in D.C. for Immigration.

12          THE COURT:  Okay.  And anything that she has shared

13   with you which would make it difficult for you to be fair and

14   impartial in this case?

15          JUROR ███████:  I don't think so.

16          THE COURT:  All right, thank you.

17          Yes, sir.

18          JUROR ███████:  Yes, I am ██████████, number 21.  I've

19   worked for a number of companies that sell into law

20   enforcement, DEA, others, FBI.  And so, I have a few friends

21   who are in those industries.

22          THE COURT:  All right.  And what's the nature of the

23   business?

24          JUROR ███████:  I've done digital forensics through a

25   company called Cellebrite.  I did biometrics, finger-based,

39

1    iris recognition.  I did surveillance and tracking software,

2    and ballistics matching.

3             THE COURT:  All right.  Any reason why any of your

4    associations with the law enforcement agencies would make it

5    difficult for you to be fair and impartial in this case?

6             JUROR ████:  No, sir.

7             THE COURT:  All right.  Thank you, ██████.

8             Yes, ma'am, in the second row.

9             JUROR ████:  Number 2, ████████.  I used to work

10   for 9-1-1 with Fairfax County as a dispatcher and call-taker.

11            THE COURT:  All right.  And how long ago did you do

12   that, ██████?

13            JUROR ████:  It would have been three years prior to

14   2012.  So it was probably around 2010 to 2012 or so.

15            THE COURT:  All right.  And that was full-time during

16   that time period?

17            JUROR ████:  Yes.

18            THE COURT:  All right.  And any reason why that

19   experience would make it difficult for you to be fair and

20   impartial in this case?

21            JUROR ████:  No.

22            THE COURT:  All right.  Thank you, ██████.

23            Yes, ma'am, in the front row.

24            JUROR ██████:  61, ████████.  My cousin was a

25   former District Attorney in New Jersey.  He is currently a

40

```
1    judge, and his parent was a federal judge.

2              THE COURT:  In New Jersey?

3              JUROR ▓▓▓▓▓:  Yes, sir.

4              THE COURT:  All right.  And anything that they have

5    shared with you which would make it difficult for you to be

6    fair and impartial here?

7              JUROR ▓▓▓▓▓:  No.

8              THE COURT:  All right, thank you very much.

9              Yes, sir.

10             JUROR ▓▓▓▓▓:  Number 73, ▓▓▓▓▓▓▓▓.  I went to

11   school with and my close friend is a drug treatment counselor.

12   And my brother-in-law is a correctional officer.

13             THE COURT:  A correctional officer?

14             JUROR ▓▓▓▓▓:  Yes.

15             THE COURT:  All right.  And any reason why anything

16   that they have shared with you would make it difficult for you

17   to be fair and impartial here, ▓▓▓▓▓▓▓?

18             JUROR ▓▓▓▓▓:  No, sir.

19             THE COURT:  All right.  Thank you, sir.

20             Anybody else on this side?  Yes, ma'am.

21             JUROR ▓▓▓▓▓▓▓:  51.  I worked at the Department

22   of Justice and Homeland Security.

23             THE COURT:  All right.  And how long ago?

24             JUROR ▓▓▓▓▓▓▓:  Department of Justice, like 2001

25   and 2003.  And following on to Homeland Security from 2003 to
```

41

1    2008.

2            THE COURT:  All right.  And what did you do with

3    them?

4            JUROR ▮▮▮▮▮▮▮▮:  I managed data.  So for the

5    Department of Justice, I supported the case management system.

6    So all of the pretrial and trial, all the way to pretrial

7    disposition, all that data.  That data, we took that

8    information and digitized it.

9            And then Homeland Security, all of the port data,

10   information coming in from, you know, ports of entry, we

11   managed that information.

12           THE COURT:  All right.  And any reason why those

13   employments would make it difficult for you to be fair and

14   impartial here?

15           JUROR ▮▮▮▮▮▮▮▮:  No.

16           THE COURT:  All right, thank you.  ▮▮▮▮▮▮▮▮▮▮,

17   right?

18           JUROR ▮▮▮▮▮▮▮▮:  Correct.

19           THE COURT:  Yes.  All right, thank you.

20           All right.  Let's go to the middle then.  Anybody in

21   the middle?  Yes, sir.

22           JUROR ▮▮▮▮:  64, ▮▮▮▮▮▮▮▮.  I have close

23   associations with the past director for the Eastern District

24   Drug Enforcement Agency.  And also a couple other friends of

25   mine are part of DEA.

42

```
1          THE COURT:  All right.  And,  �state▊▊,  any reason
2   why that would make it difficult for you to be fair and
3   impartial in this case?
4          JUROR ▊▊▊:   No, Your Honor.
5          THE COURT:  All right, thank you.  So you knew ▊▊
6   ▊▊▊ or --
7          JUROR ▊▊▊:  ▊▊▊▊.
8          THE COURT:  All right, thank you.
9          All right.  Yes, sir, ▊▊▊▊, right?
10          JUROR ▊▊▊:  Number 19, ▊▊▊▊.  I was a
11   first semester intern in the U.S. Attorney's Office in the
12   Northern District of Illinois in Chicago.
13          THE COURT:  All right.  And how long ago was that,
14   sir?
15          JUROR ▊▊▊:  That was in 2003.
16          THE COURT:  All right.  Any reason why that would
17   make it difficult for you to be fair and impartial here, sir?
18          JUROR ▊▊▊:  No, sir.
19          THE COURT:  All right, thank you.
20          Yes, ma'am, in the back.
21          JUROR ▊▊▊:  74, ▊▊▊▊.  My father on
22   behalf of the Coast Guard was the acting attorney back in the
23   '80s, I believe.  And my uncle was a judge in Michigan.
24          THE COURT:  All right.  Any reason why either of --
25   anything that either of those persons have talked about and
```

43

1    their experiences with you that would make it difficult for you

2    to be fair and impartial here, ████████?

3              JUROR ████:  No, sir.

4              THE COURT:  All right, thank you.

5              Yes, sir, on the side.

6              JUROR ████:  Number 6, ████████.  My wife works

7    for the Department of Homeland Security.

8              THE COURT:  All right.  And what does she do there,

9    ████████?

10             JUROR ████:  She is a project manager.

11             THE COURT:  Project manager?

12             JUROR ████:  Yes.

13             THE COURT:  And any reason why anything that she has

14   shared with you would make it difficult for you to be fair and

15   impartial here?

16             JUROR ████:  I don't think so, sir.

17             THE COURT:  Thank you, ████████.

18             All right.  Yes, ma'am.

19             JUROR ████:  54, ████████████.  Very close dear

20   friend is a DEA agent in Cartagena currently, Colombia.

21             THE COURT:  In where, ████████?

22             JUROR ████:  Cartagena, Colombia.

23             THE COURT:  Oh, all right.  And any reason why what

24   he or she has shared with you would make it difficult for you

25   to be fair and impartial here?

44

1            JUROR ████████:  I believe I can be fair and

2    impartial.

3            THE COURT:  All right.  Thank you, ████████.

4            Anybody else in the middle?  Yes, ma'am.

5            JUROR ██████:  Number 34, ████████████.

6            THE COURT:  Right.

7            JUROR ██████:  My husband works in law enforcement.

8            THE COURT:  Okay.  And what agency?

9            JUROR ██████:  Fairfax County Sheriff's Office.

10           THE COURT:  All right.  And any reason why the

11   information he has shared with you would make it difficult for

12   you to be fair and impartial here, ████████████?

13           JUROR ██████:  Yes, Your Honor.

14           THE COURT:  It would?

15           JUROR ██████:  Yes.

16           THE COURT:  All right.  Well, you've already got the

17   kids issue going.  So I'm not going to ask you any more.

18           Okay.  Anybody else in the middle?  Yes.

19           JUROR ██████████████:  Number 17, ████████████

20   ████████████.  Soon to be brother-in-law is a Madison County

21   police officer.  Best friend and maid of honor is a Prince

22   William County dispatcher.  I have quite a bit of friends who

23   work at Rappahannock Regional Jail in Stafford County.

24           THE COURT:  All right.  And any reason why what they

25   have shared with you would make it difficult for you to be fair

45

1    and impartial in this case?

2              JUROR ████████████:  No, sir.

3              THE COURT:  Thank you, ████████████████.

4              Yes, ma'am.

5              JUROR ██████:  Number 57, ████████.  My son is a

6    federal police officer with the FBI.  And my husband is retired

7    law enforcement with the Army.

8              THE COURT:  With the Army?

9              JUROR ██████:  Yes.

10             THE COURT:  And, I'm sorry, your son is an FBI agent

11   now?

12             JUROR ██████:  He is a federal police officer for the

13   FBI.

14             THE COURT:  Oh, a federal police officer.  Here in --

15             JUROR ██████:  At Quantico.

16             THE COURT:  At Quantico, ████████.  All right.  Any

17   reason why the experiences that either of those persons have

18   shared with you would make it difficult for you to be fair and

19   impartial in this case?

20             JUROR ██████:  No, sir.

21             THE COURT:  All right.  Thank you, ████████.

22             Anybody else in the middle?

23             All right, let's go to the far side then, please.

24   Yes, sir, in the first row.

25             JUROR 18:  Number 18, ████████.

46

```
 1            THE COURT:  Yes.
 2            JUROR ███:  Retired law enforcement after 27 years.
 3   And I spent about eight of that on a narcotics task force.
 4            THE COURT:  Okay.  And I'm sorry, what agency?
 5            JUROR ███:  Loudoun County Sheriff's Office, Your
 6   Honor.
 7            THE COURT:  All right.  And so, you worked in the
 8   narcotics section of the Police Department there or the
 9   Sheriff's Office there?
10            JUROR ███:  Yes, sir, I did.
11            THE COURT:  All right.  And any reason why you
12   couldn't be fair and impartial in this case and judge it just
13   on the evidence you hear -- the testimony that you hear and the
14   evidence that you're allowed to review?
15            JUROR ███:  Quite honestly, Your Honor, I have been
16   exposed to enough deception that probably not --
17            THE COURT:  Okay.  All right.  Thank you, ███.
18            JUROR ███:  -- in the process.  Thank you, Your
19   Honor.
20            THE COURT:  Yes, ma'am.
21            JUROR ██████:  Number 23, ██████
22   ██████.  I served as a chaplain for the Sheriff's Office
23   in Fairfax County and Loudoun County.
24            THE COURT:  All right.  And how long ago was that,
25   ██████?
```

47

```
 1              JUROR ▮▮▮▮▮▮▮:  That was back in 2000, and it
 2  stopped in 2010.
 3              THE COURT:  2000 to 2010?
 4              JUROR ▮▮▮▮▮▮▮:  Yes.
 5              THE COURT:  You were a chaplain and the detention
 6  center there in Fairfax?
 7              JUROR ▮▮▮▮▮▮▮:  Yes, under the Good Youth
 8  Ministry, I served with them.  And in Loudoun County.
 9              THE COURT:  All right.  Okay.  And do you believe you
10  could be fair and impartial in this case and judge it just on
11  the testimony that you hear and the evidence that is presented?
12              JUROR ▮▮▮▮▮▮▮:  Yes, sir.
13              THE COURT:  All right.  Thank you, ▮▮▮▮▮▮▮▮▮.
14              MR. WALSH:  Your Honor, I apologize, I didn't hear
15  her number.
16              THE COURT:  23.
17              MR. WALSH:  Thank you.
18              THE COURT:  Yes, sir.
19              JUROR ▮▮▮:  53, ▮▮▮▮▮▮▮▮▮.  My brother is a
20  police officer in D.C.  And my father was a police officer in
21  D.C.  And also a canine officer that trained narcotic dogs.
22  And my close neighbor for 24 years is a DEA agent.
23              THE COURT:  All right.  And any reason why you
24  couldn't be fair and impartial in this case notwithstanding
25  those --
```

48

1          JUROR ████: I don't believe so.

2          THE COURT: All right. Thank you, ███████.

3          Yes, ma'am, ███████.

4          JUROR ████: Number 63, ███████. My

5     sister-in-law just recently retired from the New York City

6     Police Department.

7          THE COURT: All right. And anything that she shared

8     with you that would make it difficult for you to be fair and

9     impartial in this case?

10          JUROR ████: No, sir.

11          THE COURT: All right. Thank you, ███████.

12          Yes, ma'am.

13          JUROR ███: 25, █████. I work at Quest

14     Diagnostics, I have a few acquaintances in the forensics

15     toxicology lab.

16          THE COURT: I'm sorry, you work where?

17          JUROR ███: Quest Diagnostics.

18          THE COURT: Okay.

19          JUROR ███: So there is forensic toxicology lab in

20     there, and I have a few acquaintances there, but they probably

21     are not --

22          THE COURT: Okay. Your voice keeps drifting off on

23     me. And I apologize.

24          JUROR ███: There is a forensic toxicology lab in

25     there, and I just have a few acquaintances there, but I don't

49

```
 1   really think --
 2            THE COURT:  Okay.  Any reason why that would make it
 3   difficult for you to be fair and impartial here?
 4            JUROR ███:  No.
 5            THE COURT:  Thank you, ██████.
 6            Yes, sir.
 7            JUROR ████:  Number 49, ██████████.  My
 8   father works for the Department of the Navy in the Navy Yard
 9   running security and emergency operations.  He also used to
10   work at the Pentagon Force Protection Agency pretty much doing
11   the same thing.  And he is retired Navy.  I don't know if that
12   counts.
13            THE COURT:  Any reason why his experiences that he
14   has shared would make it difficult for you to be fair and
15   impartial here?
16            JUROR ██████:  No, sir.
17            THE COURT:  All right.  Thank you, ████████.
18            Yes, sir.
19            JUROR ██████:  Number 27, ████████.
20            THE COURT:  Yes, sir.
21            JUROR ██████:  My father was a police officer in --
22            THE COURT REPORTER:  A police officer where?
23            JUROR ██████:  Boston.
24            THE COURT:  I would have guessed that.  Any reason
25   why his experiences would make it difficult for you to be fair
```

50

1   and impartial here, ▮▮▮▮▮▮?

2          JUROR ▮▮▮▮:  No, Your Honor.

3          THE COURT:  Thank you, sir.

4          Anybody else?  Yes, sir.

5          JUROR ▮▮▮▮:  39, ▮▮▮▮▮▮▮.  My stepfather

6   was a budget officer for the DEA.

7          THE COURT:  Was what type of officer?

8          JUROR ▮▮▮▮:  Finance officer.

9          THE COURT:  A financial officer.  And, ▮▮▮▮▮,

10  any reason why that would make it difficult for you to be fair

11  and impartial here?

12         JUROR ▮▮▮▮:  No.

13         THE COURT:  Thank you, sir.

14         Anybody else?  Yes, ▮▮▮▮.

15         JUROR ▮▮:  Number 14, ▮▮▮▮▮.  My

16  daughter-in-law was a prosecutor, I think in the state of

17  Nevada a number of years ago.  She currently works with the

18  U.S. Institute of Peace here in D.C.

19         THE COURT:  The Institute of Peace here in D.C.?

20         JUROR ▮▮:  Yes.

21         THE COURT:  All right.  And any reason why the

22  information she has shared with you would make it difficult for

23  you to be fair and impartial here, sir?

24         JUROR ▮▮:  No, sir.

25         THE COURT:  All right.  Thank you, ▮▮▮▮.

51

1          Yes, sir.

2          JUROR ███████:  Number 35, █████████████.  My

3    brother-in-law was a former U.S. Customs agent.

4          THE COURT:  A Customs agent?

5          JUROR ███████:  Yes.

6          THE COURT:  And where did he serve, if you recall?

7          JUROR ███████:  He was in New York, primarily JFK?

8          THE COURT:  All right.  And how long ago was that?

9          JUROR ███████:  About 15 years ago.

10         THE COURT:  All right.  ██████████, any reason why

11   the information he has shared would make it difficult for you

12   to be fair and impartial in this case?

13         JUROR ███████:  No.

14         THE COURT:  All right.  Thank you, sir.

15         Would any of you give greater weight to the testimony

16   of a law enforcement officer over say a lay witness simply

17   because of their employment as a law enforcement officer?

18         Do any of you --

19         THE COURT SECURITY OFFICER:  Judge, one more.

20         THE COURT:  I'm sorry.

21         JUROR ██████:  39, ██████████████.  I think I

22   would.

23         THE COURT:  Well, if I instruct you that all

24   witnesses must be judged for their credibility and weighed

25   individually by you regardless of whether they are experts, or

52

1    they are law enforcement, or what type of experiences they

2    have, will you follow that instruction, ███████████?

3              JUROR ██████:  Yes.

4              THE COURT:  All right.  Thank you, sir.

5              Yes, ████████.

6              JUROR ████:  On the case I served on in Washington

7    state, the police officer's testimony did not agree with his

8    reports.  So I would go the opposite way.  I'm not sure you can

9    trust anybody.

10             THE COURT:  All right.  Well, yeah, having -- that's

11   why you-all are here, is to judge the credibility of each of

12   our witnesses and base your verdict, once you judge the

13   credibility of each witness and give the witness the weight

14   that you believe that testimony deserves, regardless of the

15   individual characteristics, whether they're an expert, or

16   whether they're law enforcement, or whether they're relatives,

17   whatever it may be, that's what judging the evidence is all

18   about.

19             So, do you have any problem with independently

20   reviewing the testimony of each of our witnesses, █████████, and

21   making a decision based on those credibility findings?

22             JUROR █████:  No.

23             THE COURT:  All right, thank you.

24             All right.  Do you or any member of your family have

25   any legal training or background, legal secretary, lawyer,

53

1  paralegal?

2          Let's start over on the left side.  Yes,

3  ███████

4          JUROR ██████:  My uncle is an attorney.

5          THE COURT:  All right.  And what kind of law does he

6  practice?

7          JUROR ██████:  Malpractice.

8          THE COURT:  All right.  So the civil side work.  So

9  no problem with any conflicts.  Thank you, ████████.

10  ████████.

11          JUROR ██████:  Yeah, number 39.  My brother is an

12  attorney for the Maritime Administration of the Department of

13  Transportation.

14          THE COURT:  The Maritime section of --

15          JUROR ██████:  Maritime Administration.

16          THE COURT:  Of TSA?

17          JUROR MCSHANE:  Department of Transportation.

18          THE COURT:  Department of Transportation.  All right.

19  And anything that he has shared with you that would make it

20  difficult for you to be fair and impartial, sir?

21          JUROR ██████:  No, sir.

22          THE COURT:  Thank you, ████████.

23          Yes, sir.

24          JUROR ██████:  Number 15, ████████.  My mother was

25  a legal secretary to Justice White and Justice Brennan in the

54

1    Supreme Court for many years.

2              THE COURT:  Oh, what an interesting job.

3              JUROR ███████:  Yes.  She has been retired for a long

4    time.

5              THE COURT:  All right.  And anything that she shared

6    with you which would make it difficult for you to be fair and

7    impartial here, sir?

8              JUROR ███████:  No, sir, not at all.

9              THE COURT:  All right.  Thank you, ██████████.

10             Anybody else on this side?  Yes.

11             JUROR ███████:  61.  My cousin is a judge, federal

12   judge.

13             THE COURT:  Right, as you said.  Any problem serving

14   with that?

15             JUROR ███████:  No.

16             THE COURT:  All right.  Thank you, ██████████.

17             Anybody in the middle?  Yes.

18             JUROR ██████  58.  I'm an attorney.

19             THE COURT:  All right.  What kind of law do you

20   practice?

21             JUROR ███████:  Currently financial, banking.

22             THE COURT:  All right.  Have you in the past done any

23   criminal defense work or work in a prosecutor's office?

24             JUROR ██████:  No, public defender system.

25             THE COURT:  Public defender's office.  How long ago

55

1   was that?

2          JUROR ███: Oh, gosh.  Probably like 25 years ago.

3          THE COURT:  All right.  Any reason why those

4   experiences would make it difficult for you to be fair and

5   impartial in this case?

6          JUROR ███: No.

7          THE COURT:  All right, thank you.

8          Yes, ma'am, in the middle.

9          JUROR ███: 13, ████████.  My uncle was a

10  patent attorney here in this area.

11         THE COURT:  All right.  ██████, any reason why

12  that would make it difficult for you to be fair and impartial

13  here?

14         JUROR ███: No, sir, nothing at all.

15         THE COURT:  Thank you, ██████.

16         Yes, ma'am.

17         JUROR ███: Number 10, ████████.  My

18  husband is a lawyer.

19         THE COURT:  All right.  And what kind of law does he

20  practice?

21         JUROR ███: He is assistant general counsel to

22  General Dynamics.

23         THE COURT:  To General Dynamics.  All right.  And any

24  reason why his job and what he has told you about his work

25  would make it difficult for you to be fair and impartial in

56

1   this case?

2          JUROR ██████:  No, sir.

3          THE COURT:  All right.  Thank you, ████████.

4          Yes, ma'am, on the side.

5          JUROR ██████:  Number 36, ████████████.  I'm

6   an attorney, and my husband is as well.

7          THE COURT:  All right.  And what type of law do you

8   each practice?

9          JUROR ██████:  I do health care law, mostly on the

10  policy side.  And my husband, he works for the Patent Office

11  just next door, he is a patent examiner.

12         THE COURT:  All right.  And any reason why either of

13  your occupations would make it difficult for you to be fair and

14  impartial here, ████████████?

15         JUROR ██████:  No, sir.

16         THE COURT:  Thank you.

17         Yes, ████████.

18         JUROR ██████:  Number 19, ██████████.  I am an

19  attorney.  And my wife is also an attorney.

20         THE COURT:  Right.  And what kind of law do you each

21  practice?

22         JUROR ██████:  My wife is an attorney at the

23  Federal Trade Commission, practicing antitrust law.  And I

24  recently began a private practice and am working in banking and

25  financial fitness.

57

1          THE COURT:  All right.  Any reason why either of

2    those occupations would make it difficult for you to be fair

3    and impartial here?

4          JUROR ███████:  No.

5          THE COURT:  Thank you, ██████████.

6          Anybody else in the middle?  Yes, ma'am.

7          JUROR ██████:  74, ████████████.

8          THE COURT:  Right.

9          JUROR ██████:  In addition to what I have already

10   mentioned of my father in the Coast Guard and my uncle as a

11   judge, my uncle's daughter, my cousin, is a lawyer.

12         THE COURT:  Okay.  And again, any reason why any of

13   those persons sharing any information would make it difficult

14   for you to be fair and impartial?

15         JUROR ██████:  No.

16         THE COURT:  All right.  Thank you, ██████████.

17         Anybody else in the middle?  Yes, █████████.

18         JUROR ██████:  34, ██████████.  My brother-in-law is

19   a lawyer in New York.  I'm not sure what type of lawyer.  And

20   that would have no impact on me.

21         THE COURT:  Okay.  Thank you, █████████.

22         All right, on the side.  Yes, ████████.

23         JUROR ███████:  Number 63, ████████████.  I am a

24   legal secretary.

25         THE COURT:  Right.  And what type of practice do you

58

1    work in?

2             JUROR ▮▮▮▮:  Currently environmental law.

3             THE COURT:  All right.  And did you work in the

4    criminal defense area or prosecution area in the past?

5             JUROR ▮▮▮▮:  No.

6             THE COURT:  All right.  Any reason why that would

7    make it difficult for you to be fair and impartial here, ▮▮

8    ▮▮?

9             JUROR ▮▮▮▮:  No, sir.

10            THE COURT:  Thank you.

11            Yes, sir, ▮▮▮▮▮▮, right.

12            JUROR ▮▮▮▮:  Number 27, ▮▮▮▮▮▮.  I'm a

13   lawyer.

14            THE COURT:  And what kind of law do you practice,

15   sir?

16            JUROR ▮▮▮▮:  Civil litigation.

17            THE COURT:  All right.  Have you done criminal

18   defense or prosecution work in the past?

19            JUROR ▮▮▮▮:  No, Your Honor.

20            THE COURT:  Any reason why that would make it

21   difficult for you to be fair and impartial here?

22            JUROR ▮▮▮▮:  No, Your Honor.

23            THE COURT:  Thank you, ▮▮▮▮▮▮.

24            Anybody else?  Yes, ▮▮▮▮▮.

25            JUROR ▮▮▮:  My wife worked as a legal secretary in

59

1    Columbus probably in the late '80s.  I think it was civil, I

2    believe, for a couple of attorneys.

3            THE COURT:  Civil practice?  I'm sorry, I didn't your

4    last --

5            JUROR ███:  I say, she worked for two lawyers, and

6    they did I think just civil cases, they worked on those type of

7    cases.

8            THE COURT:  All right.  Anything that she has shared

9    with you which would make it difficult for you to be fair and

10   impartial?

11           JUROR ████   No, sir.

12           THE COURT:  All right.  Thank you, █████.

13           Anybody else?

14           I have got a couple of questions that I'm going to

15   invite you to come to the sidebar about.  They may require you

16   to impart some personal information.  And in an abundance of

17   caution, I want to make sure that that is received in

18   confidence at the sidebar.

19           So please listen to this series of questions.  And

20   I'll do my best to repeat them.  Have you or any member of your

21   family or close friend been the victim of a crime, including a

22   crime involving a weapon?

23           Second, have you ever been involved in any court in a

24   criminal matter that concerned yourself or a member of your

25   family or close friend either as a defendant, a witness, or a

60

1   victim?

2          Have any of you or family members participated in

3   substance abuse treatment?

4          And are there any of you that have or -- any of you

5   that have been affected by either drugs or firearms to the

6   extent that you believe that you could not be fair and

7   impartial as a juror in this case?

8          So if your answer is yes to any of those questions,

9   if you would follow Mr. Ruelas' lead and line up.

10         And then I'll ask counsel to come to sidebar, please.

11         NOTE:  A sidebar discussion is had between the Court

12  and counsel out of the hearing of the jury panel as follows:

13  AT SIDEBAR

14  

15  

16  

17  

18  

19  

20  

21  

22  

23  

24  

25







64



["

66













72





74









78







81



82





84











89



90



23          NOTE:  The sidebar discussion is concluded; whereupon

24  the case continues before the jury panel as follows:

25  BEFORE THE JURY PANEL

1          THE COURT:  All right.  Thank you, ladies and

2    gentlemen.  I touched on it with the last questions that I have

3    asked you which resulted in your coming to the sidebar.  But

4    more generally, are there any members of the panel who believe

5    that the testimony that you'll hear about weapons and violence

6    and murders and drugs, do any of you believe that just based on

7    that alone you cannot be fair and impartial and judge this case

8    just based on the evidence that you hear and the law that I

9    give you?

10          Mr. Fagot-Maximo is from Honduras, and many of the

11   Government's witnesses are also from Honduras.  Does any member

12   of the panel believe that he or she cannot be fair and

13   impartial because of any media coverage of the migrants coming

14   from Central America that you've heard about on the news coming

15   in through Mexico who are now on the border?  Any reason why

16   that would cause any of you to be unable to be fair and

17   impartial in this case?

18          Almost all of the witnesses will testify through an

19   interpreter, and their first language is Spanish.  Does anybody

20   have difficulty with being able to listen to the -- carefully

21   listen to the testimony of the interpreter and judge the

22   testimony through the use of the interpreter without any kind

23   of bias or prejudice?

24          For those who may be fluent in Spanish, the witnesses

25   will testify in Spanish.  We have professional certified

92

1    interpreters who will translate into English.  And there may be

2    differences in -- we would believe not, but there may be

3    differences in what you hear in Spanish as someone fluent in

4    Spanish versus what the interpreter translates into English.

5    You are required, even though you're fluent in Spanish, to

6    accept the interpreter's English language translation.

7            Do any of you believe that you would have trouble

8    doing that?

9            You may hear, or may not, but in an abundance of

10   caution, the name El Chapo come up.  It's a nickname used.

11   There is a case in New York now going on with an individual

12   named El Chapo.  Has anybody followed that case?  Yes.

13           There won't be any testimony coordinating that case

14   with this case, and there may not be any reference but of a

15   distant family member.  Would anybody have any difficulty

16   putting any information that you have received on the El Chapo

17   case aside and judging the case just based on what you hear in

18   the courtroom here and the evidence and the law that I give

19   you?

20           Okay.  Do all of you -- let me say it this way.  An

21   indictment, which I have referenced in the beginning of our

22   voir dire this morning, is a formal means by which the

23   Government charges a defendant in a case.  It's not evidence

24   against the defendant.  It is the legal vehicle through which

25   charges are brought through a grand jury.

93

1          Do any of you believe that a defendant who has been

2    indicted must be guilty of something or else he wouldn't have

3    been charged?

4          In other words, are you all willing to put aside the

5    fact that someone may have been formally charged and judge the

6    guilt or innocence of Mr. Fagot-Maximo just based on the

7    evidence you hear in the courtroom and the law that I give you?

8          Are any of you sensible to any bias or prejudice

9    against the United States or the defendant that would make it

10   difficult for you to be fair and impartial in this case?

11         Do you all understand that the defendant is presumed

12   to be innocent?

13         Do you understand the Government must prove the

14   defendant's guilt beyond a reasonable doubt?

15         Do you understand that the defendant is not required

16   to produce any evidence?

17         All right.  Let me see counsel at sidebar then.

18         NOTE:  A sidebar discussion is had between the Court

19   and counsel out of the hearing of the jury panel as follows:

20   AT SIDEBAR

21         THE COURT:  All right.  First, any additional

22   questions that you think I should have asked but didn't?  I

23   think I pretty much covered the questions.

24         MR. PETROVICH:  The only thing that came to my mind

25   is some of the jurors may have sat on juries before, only civil

94

1    cases.   Sometimes it's confusing because the burden of proof is

2    different in a civil case than a criminal case.   I guess that

3    was one question I would follow up on just to make sure they

4    understand there is different burdens.

5            THE COURT:   I will make that clear to them in my

6    initial instructions after we seat them.

7            MR. PETROVICH:   Okay.

8            THE COURT:   Then let's go with excuses for cause.

9            Mr. Trump.

10            MR. TRUMP:   Do you want to go through the conflict

11    issue first?   Because that may eliminate argument over cause

12    with respect to some of them.

13            THE COURT:   All right.

14            MR. TRUMP:   First was number 54.

15            THE COURT:   Worship services.   We have got two

16    different worship services.   But she's also, I believe,

17    conflicted out by the murder.

18            MR. WALSH:   Yes.

19            THE COURT:   So let's excuse 54.

20            MR. TRUMP:   Number 71 has a prepaid trip, and I think

21    you've already excused her anyway.

22            MR. WALSH:   ███████ .

23            THE COURT:   ███████ , yeah.

24            MR. TRUMP:   Number 17 has a business trip.

25            THE COURT:   She has also got the -- 17 is ██

95

1   ███████████ .

2           MR. TRUMP:  Or, excuse me, she has a business at

3   night.

4           THE COURT:  She has a second job that she works every

5   night.  Any objection to excusing her?

6           MR. WALSH:  No objection.

7           THE COURT:  17 is excused.

8           ██████████  is 19, he has got the business trip next

9   Monday in Florida where he's meeting somebody from overseas.

10  Is there any objection?

11          MR. WALSH:  No objection.

12          MR. TRUMP:  We're a little worried about our numbers,

13  Judge, but --

14          MR. WALSH:  Number 7 is --

15          MR. TRUMP:  Let's stay on number 19 for a second,

16  please.

17          THE COURT:  Hold on.

18          MR. TRUMP:  I don't know if he said that he was

19  essential or not.  I guess if he is, I have no problem striking

20  him, but I'm a little worried about our numbers.

21          THE COURT:  Let's see where we are at the end of the

22  day.  We will hold on to him.

23          MR. WALSH:  I think 19 said Monday, business trip,

24  Florida, that he had to go down for.

25          THE COURT:  Okay.

96

1          MR. TRUMP:  Number 34.  I think she had also said she

2    could not be fair in any way.

3          THE COURT:  Yes.  Any objection to excusing 34?

4          MR. WALSH:  No objection.

5          THE COURT:  34 is out.

6          MR. TRUMP:  Number 60 has child care through next

7    Thursday, which I think is sufficient.

8          THE COURT:  Yeah.

9          MR. TRUMP:  Number 53 is working out of state.

10         THE COURT:  Yeah, he has got Eastern Maryland all

11   next week on a construction site.  I think they can get along

12   without him, if necessary.  But do you want to excuse him or

13   not?

14         MR. WALSH:  I think we should excuse him.  He made a

15   comment that I am not sure the Court heard about he would like

16   to get out, but he has to be there.  A comment of some sort,

17   something like that.  He got a chuckle.

18         THE COURT:  Any objection to excusing 53?

19         MR. TRUMP:  Again, I don't think it was unequivocal

20   that he was essential.

21         THE COURT:  Yeah, he's on a team.  All right, we will

22   hold on to 19 and 53 for now, see where our numbers are.

23         MR. TRUMP:  Number 67 has a contract out of state

24   next week.

25         THE COURT:  Yeah, Michigan.

1          MR. WALSH:  Michigan and San Diego for the Marines.

2          THE COURT:  Yeah.  Any objection to excusing him?

3          MR. WALSH:  No objection.

4          THE COURT:  I think it was a firm commitment.  67.

5          MR. TRUMP:  Number 24 has a trip to Florida that is

6    continuing education for his license.

7          MR. WALSH:  For his licensed engineer education.

8          THE COURT:  Is there any objection to excusing -- I

9    wasn't sure whether that was an excuse that he just thought up

10   on the moment or whether that was legit.  But it was CLE for

11   his civil --

12         MR. PETROVICH:  Civil engineering continuing

13   education.

14         THE COURT:  All right.  Any objection to excusing

15   him?

16         MR. WALSH:  No objection.

17         THE COURT:  Let's excuse 24.

18         MR. TRUMP:  Number 30 has a doctor's appointment next

19   Wednesday morning.

20         MR. WALSH:  Did she say next Wednesday or Wednesday

21   of the following week?

22         MR. TRUMP:  This Wednesday?

23         THE COURT:  Yeah, but it was just a follow-up to --

24         MR. WALSH:  I don't know if it was a follow-up.  I

25   think what she did is she said she gave blood then to go to the

98

1   doctor's appointment.  And so, she gave blood beforehand.  But

2   I don't know if she said it was this Wednesday or next

3   Wednesday.  I just had Wednesday written down.

4            THE COURT:  She can reschedule that one.  I'm not

5   going to excuse her for that.

6            MR. TRUMP:  Number 7 is the auto mechanic.

7            MR. WALSH:  That's the one that I was going to talk

8   about.

9            MR. TRUMP:  It's not his hardship, but it's his

10  business' hardship.

11           THE COURT:  Yeah.  My fear is that he is going to

12  wind up going and working every night after he sits on the jury

13  all day because of the cars backing up.

14           So is there any objection to excusing him?

15           MR. WALSH:  No objection.

16           MR. PETROVICH:  No objection.

17           THE COURT:  All right, let's excuse him, number 7.

18           MR. TRUMP:  Number 1 had something, but I didn't --

19           MR. WALSH:  He has a final exam at 6 p.m.

20           MR. TRUMP:  Oh, final exam.

21           MR. WALSH:  I didn't know if we should address that

22  as to how serious this exam is.  Is it elective?  It sounds

23  like his English is his second language.  And he's at NOVA, so

24  it's probably -- so it could be a conflict.  It's a 6 p.m.

25  test, and I don't know what day of the week it was.

99

```
 1            THE COURT:  Thursday.

 2            MR. WALSH:  Thursday.

 3            MR. PETROVICH:  Our concern is him going to be trying

 4   to study during his service and things like that.

 5            THE COURT:  All right.  Any objection to excusing

 6   him?

 7            MR. WALSH:  No, Your Honor.

 8            THE COURT:  All right, let's excuse him.  I thought

 9   his English was rather limited as well.

10            MR. TRUMP:  Number 36 had a flight on December 12,

11   which should not be a problem.

12            THE COURT:  No.

13            MR. TRUMP:  55, I guess if he has no replacement, he

14   has to work all night.  So --

15            THE COURT:  Yeah.  I've got to think that they can

16   adjust their schedule there and have somebody else do the work

17   during the day.

18            I don't know, what do you --

19            MR. WALSH:  I was a little confused.  He says he is a

20   auditor at a hotel, it sounds like a small hotel, in Manassas.

21            THE COURT:  I think it was several hotels.

22            MR. WALSH:  Several hotels?

23            THE COURT:  And he works the 11 to 7 shift.  So it's

24   a question of whether he gets any sleep or not.  I don't

25   normally excuse people for that reason, but do you want to see
```

100

1   how many we have?  And let's add him to our possible list.

2           MR. WALSH:  Okay.

3           MR. PETROVICH:  52 was my last one.

4           THE COURT:  She's an eighth grade teacher.  I believe

5   they will get along without her.

6           All right, let's go to cause.

7           THE CLERK:  What about ███████, who said he can't

8   speak English.

9           THE COURT:  Oh, yeah.

10          MR. WALSH:  I have him down, limited English, number

11  56, ██████.

12          THE COURT:  56.  He didn't have too much trouble

13  answering my questions, but he obviously is uncomfortable.  Do

14  you want to excuse -- any objection to excusing ██████

15          MR. TRUMP:  Which one is that?

16          MR. WALSH:  56.

17          THE COURT:  56.  He was the one who stood up and said

18  he had limited English.  Although he understood what I was

19  saying, he said he wasn't picking it all up.  Is that what you

20  got from him?

21          MR. WALSH:  He also didn't answer your question of

22  how long he was in the country.

23          THE COURT:  Yeah, that's true.

24          MR. WALSH:  He avoided that.

25          THE COURT:  It doesn't matter anymore.  It just

1    depends upon what area of the country, I guess, you live in.

2           MR. WALSH:  That's true.  Do you want to hold onto

3    him, Judge, just in case?

4           MR. TRUMP:  Defer to the Court.

5           THE COURT:  All right, let's excuse ███████, 56.

6           MR. TRUMP:  So you want our cause strikes now?

7           THE COURT:  Yes.

8           MR. TRUMP:  I think the last juror, potential juror

9    number 13, she is just too involved in the criminal justice

10   process, testifying about substance abuse, mental health

11   issues.  I just don't think she can put that completely aside.

12   It's just 30 years worth of this stuff.

13          MR. WALSH:  That was the Court's most pointed

14   question when you asked her exactly if she could do that.  And

15   she said she could put it aside.

16          I hesitate on her because she said she spoke for the

17   prosecution and then came in for the defense.  And that was

18   somewhat neutral.  And the Court had the question, can you put

19   that aside?  And she said, yes, I can put it aside.

20          I think there is other jurors that were less secure

21   in their answers than she was.

22          THE COURT:  Okay.  Frankly, I'm not sure based on her

23   answers whether if she had a bias, where it would lead.  And it

24   could be against the defendant versus for the defendant.

25          So I'm not going to excuse 13.  Your exception is

102

1    noted.

2          MR. WALSH:  Your Honor, number 16 has a nephew who is

3    incarcerated for eight years.  She said she can be fair.  What

4    concerned me is she said, I think I can, when you asked her if

5    she could set it aside and be fair and impartial both to the

6    defendant and the prosecution.

7          THE COURT:  The way she said it, I didn't have any

8    occasion to follow up because I think she said it more like, I

9    think I can.  And so, I didn't -- she is the one that had the

10   relative with the fentanyl issue as well, the same person.

11         MR. WALSH:  Right.

12         MR. TRUMP:  Judge, we would --

13         MR. WALSH:  We would strike number --

14         THE COURT:  Hold on, hold on.

15         MR. TRUMP:  We will go through your strikes.

16         THE COURT:  Stay on 16.  Do you want her struck?

17         MR. TRUMP:  I don't think she was so unequivocal that

18   she should be struck.

19         THE COURT:  Okay.

20         MR. WALSH:  We won't strike her.

21         THE COURT:  I'm sorry?

22         MR. WALSH:  We will not strike her.  We will withdraw

23   that.

24         THE COURT:  Okay.  All right.

25         MR. WALSH:  I wanted -- I mean, I didn't mean to

103

1    interrupt you --

2              MR. TRUMP:  No, go ahead, why don't we go through

3    yours first.

4              MR. WALSH:  Well, number 18, I wanted -- I think

5    it's number 18.

6              THE COURT:  He said he could not be fair.

7              MR. WALSH:  Right.

8              THE COURT:  And that's law enforcement, undercover

9    guy.

10             MR. WALSH:  Which is curious.  He said, deception,

11   I've seen too much deception.  I noted that down.  So I think

12   he has to be struck.

13             THE COURT:  I'm going to strike him for cause.  18.

14             MR. WALSH:  I believe the next one I would have would

15   be number 39.  And the reason why I say that is he said he

16   would take the law enforcement's testimony over the defendant's

17   testimony.  And then you asked him further.  His answer was --

18   he answered it -- he brought it out for the Court when he said,

19   I will take law enforcement's testimony over a defendant or

20   other witness' testimony.

21             The Court then came back and said, can you set that

22   aside.  I don't believe he can.

23             THE COURT:  Well, I said, you have to be willing to

24   judge the credibility of every witness individually based on

25   their testimony.  He said he would.

104

1          MR. WALSH:  I would move to strike him for cause.

2     When he said that, there really wasn't a question about --

3     well, it was a question about credibility.  And he announced

4     it, that he would take an officer over another witness.

5          THE COURT:  Right.

6          MR. WALSH:  So I have reservations about him.  I

7     would move to strike 39.

8          MR. TRUMP:  I disagree, Your Honor.  You asked the

9     pointed question and he gave the answer.

10         THE COURT:  Yeah.  Your exception is noted.  I'm not

11    going to remove ████████████ from the panel.

12         MR. WALSH:  The next one would be the gentleman that

13    came up here, I know he said he could set it aside, it was

14    number 46, ██████████████████.  He talked about the drive-by

15    shootings.  He sounded like it is recent and it has had an

16    effect.  It is a close call with him, I think.

17         THE COURT:  The Government's position.

18         MR. TRUMP:  We have no objection to ████████████.

19         THE COURT:  I'm sorry?

20         MR. TRUMP:  We have no objection to him.  I think he

21    answered your questions completely, he said he could be fair.

22         THE COURT:  Yeah.  I mean, he came forward and he was

23    very candid in identifying more information than was even

24    requested with him.  And at the end of the questioning he was

25    very clear that he could be fair and impartial.

```
 1              So I'm not going to strike him.  Your exception is

 2    noted.

 3              MR. WALSH:  Thank you.  We struck 62 already, didn't

 4    we?

 5              MR. TRUMP:  No.

 6              MR. WALSH:  This is the gentleman that said drugs

 7    have altered his life.

 8              THE COURT:  62, ███████████.

 9              MR. WALSH:  Yes.

10              THE COURT:  He said he couldn't be fair.

11              MR. WALSH:  Right.

12              THE COURT:  Any objection to striking ████████, 62?

13              MR. WALSH:  The gentleman who said his mother

14    committed suicide.

15              MR. TRUMP:  Oh, okay.

16              COURT:  Strike 62.

17         71 is █████, we've already struck her.

18              MR. WALSH:  I think that's all I have, Judge.

19              MR. TRUMP:  Judge, we would have number 23, she works

20    extensively in the jail, including Fairfax County Jail.

21              THE COURT:  ███████████, yeah.

22              MR. TRUMP:  Half of our prisoners are in the Fairfax

23    County Jail right now.  Again, it's just -- I don't think she

24    can divorce her experiences in the jail with prisoners from the

25    ability to hear testimony from all but one witness who is
```

106

1    incarcerated.

2            THE COURT:  I hadn't thought about her running into

3    actual witnesses.

4            MR. WALSH:  I would submit, Judge, that the

5    Government read its list of witnesses and she did not raise her

6    hand as knowing any of them or seeing any of them.  And I would

7    submit that there has been no testimony or no statements by

8    her -- not testimony, but statements by her that indicates any

9    bias or prejudice that she couldn't be fair and impartial and

10   follow the letter of the law.

11           THE COURT:  She did say that.  But I'm worried about

12   her recognizing somebody's face from her work in the jail.  And

13   I hadn't thought about that previously.  That concerns me.

14           I'm going to strike her, and your exception is noted.

15           MR. TRUMP:  I'm a little confused about number 14,

16   Judge, because he blurted out a comment that you can't trust

17   anyone anymore.  I don't know what that means.

18           THE COURT:  ██████████, yeah.

19           MR. TRUMP:  We actually had him on our list as an

20   acceptable juror from the Government's standpoint.  But given

21   his vision issues and that statement that he can't trust anyone

22   anymore, I'm just worried that he is one of those jurors that

23   might --

24           THE COURT:  Not follow the law.

25           MR. TRUMP:  -- not follow the law or just not

107

1    deliberate collegially.

2         MR. WALSH:  I go both ways with him.  I didn't hear

3    any answers that he would be prejudiced, although he

4    volunteered a lot of things.  Mr. Trump is right, I did hear

5    that comment about trust, but I'm not sure if it goes against

6    the defendant.  That's how I understood it, that he doesn't

7    trust any defense attorney.

8         MR. TRUMP:  I'm not worried about the Court or the

9    attorneys or perhaps even the witnesses, but he has to sit down

10   with 11 others and deliberate.  And if he can't trust his

11   fellow jurors, that's to me an issue.

12        MR. WALSH:  I'll leave it to the Court's discretion.

13        THE COURT:  All right, let's strike ███████, 14.

14   That answer did concern me.  And I, obviously, tried to

15   rehabilitate him, and I got a chuckle out of him, but I'm not

16   sure what that meant either.

17        MR. TRUMP:  That's it from the Government.

18        MR. WALSH:  I think that's all we have.  Unless there

19   is someone else we're missing.

20        THE COURT:  Listen carefully.  Let's go over the list

21   one more time from Amanda.

22        MR. TRUMP:  Of what's left?

23        THE COURT:  No, just the strikes.

24        MR. TRUMP:  In order?

25        THE COURT:  Yes.

108

```
1              THE CLERK:  We have 1, 7, 14, 17, 18, 23, 24, 34,
2    54 --
3              THE COURT:  Yes.
4              THE CLERK:  56.
5              THE COURT:  Yes.
6              THE CLERK:  62.
7              THE COURT:  Yes.
8              THE CLERK:  67.  And 71.  That leaves us with 52
9    right now.  And then we have the three on hold.
10             THE COURT:  All right.  Let's excuse 19, 53, and 55
11   then.
12             MR. TRUMP:  19?
13             THE COURT:  ███████████  with the travel.  53 is
14   █████  going to Maryland, out-of-state work.  And 55 is
15   █████████, who works all night.  Okay?
16             MR. TRUMP:  Okay.
17             THE COURT:  All right.  Ready to select our jury?  Do
18   you need a break, or are you --
19             MR. TRUMP:  Let's get it over with, Judge.
20             MR. WALSH:  Is the interpreter okay?
21             MR. TRUMP:  Unless Norman needs a break.
22             THE COURT:  No.
23             NOTE:  The sidebar discussion is concluded; whereupon
24   the case continues before the jury panel as follows:
25   BEFORE THE JURY PANEL
```

1          THE COURT:  All right, thank you for your patience,

2     ladies and gentlemen.  That concludes our sidebar and we will

3     now begin selecting our jury.  When you hear your name called,

4     please come forward and Mr. Ruelas will direct you.

5          I assure you that although we don't have the lottery

6     balls banging around in that glass oval, that it's a random

7     selection and that your names are being called out of a bin

8     which has been shaken up.

9          THE CLERK:  Ladies and gentlemen, as I call your

10    name, would you please come forward and have a seat in the jury

11    box as instructed by our Court Security Officer.

12          Juror number 2, ████████.  Juror number 52, ████

13    ████████.  Juror number 20, ████████.  Juror number

14    25, ████████.  Juror number 36, ████████████.  Juror

15    number 70, ████████████.  Juror number 27, ████████████.

16    Juror number 10, ████████████.  Juror number 15, ████

17    ███.  Juror number 50, ████████████.  Juror number 47,

18    ████████████.  And juror number 48, ████████████.

19          NOTE:  The lawyers begin to exercise their

20    strikes.

21          MR. WALSH:  Your Honor, may we approach?

22          THE COURT:  Yes, sir.

23          NOTE:  A sidebar discussion is had between the Court

24    and counsel out of the hearing of the jury panel as follows:

25    AT SIDEBAR

110

1          THE COURT:  Mr. Walsh.

2          MR. WALSH:  Yes, Your Honor.  Thank you.  The defense

3   makes a <u>Batson</u> challenge.  The only juror struck by the

4   Government was Hispanic, ███████████████.  And I would

5   challenge that as to cause and why that juror was struck under

6   <u>Batson</u>.

7          THE COURT:  Well, do you know anything about ███

8   ███  other than he has a last name that may be Latin?

9          MR. WALSH:  That's my understanding.  I can get my

10  notes.  One second.

11         THE COURT:  He is number 47, ████████████████

12  ████.

13         MR. WALSH:  No kids, he's pre-school teacher, Judge.

14  I believe he is a -- he lives in Manassas.  I'm not sure, but I

15  believe he is Hispanic of some nature, that's why I'm raising

16  the <u>Batson</u> challenge.

17         THE COURT:  All right.  Mr. Trump.

18         MR. TRUMP:  Judge, the first prerequisite for a

19  successful <u>Batson</u> challenge is a pattern of discrimination, at

20  least prima facie discrimination based on race.  It hardly can

21  be a pattern with the first strike.

22         Secondly, ██████ is a name that has come up

23  frequently in this and related investigations.  There are many

24  extended families where that name has arisen.  I don't want to

25  take the chance that out of the blue he recognizes someone or

111

1    something as being a cousin, uncle, whatever.

2            Perhaps it's a very common name, I don't know, but I

3    just simply don't want to take the chance that somehow as the

4    evidence unfolds he realizes that someone that he knows or is

5    related to is involved.

6            THE COURT:  Okay.

7            MR. WALSH:  Your Honor, to address the first issue.

8    The first strike can be a pattern.  There is case law on that.

9    I don't have it with me, however.

10           As to Mr. Trump's explanation, I would just maintain

11   my Batson challenge.  I don't know what their investigation

12   holds or what names have come up.

13           THE COURT:  Well, I have had probably 40 defendants

14   come out of this conspiracy, and ██████ is clearly a name that

15   I recognize.  I don't know if there is any relation either, but

16   I think that the explanation is a neutral explanation that is

17   reasonable in light of the breadth of this case which involves

18   literally hundreds of people in the Northern Virginia

19   community.

20           So, your exception is noted.

21           MR. WALSH:  Thank you, Your Honor.

22           THE COURT:  All right, thank you.

23           NOTE:  The sidebar discussion is concluded; whereupon

24   the case continues before the jury panel as follows:

25   BEFORE THE JURY PANEL

112

1          NOTE:  The lawyers continue to exercise their

2     strikes.

3          THE CLERK:  The following jurors may return to their

4     seats in the courtroom:  Juror number 47, ███████████.

5     Juror number 2, ████████.  Juror number 70, █████

6     ███████.  Juror number 10, █████████████.  And juror

7     number 27, ████████.

8          NOTE:  The above-named jurors return to their seats

9     in the courtroom?

10          THE CLERK:  As I call your name, would you please

11     come forward and have a seat in the jury box as instructed by

12     our Court Security Officer.

13          Juror number 46, ██████████.  Juror number 73,

14     ███████.  Juror number 72, ████████████.  Juror

15     number 13, ████████.  And juror number 3, ██████████.

16          NOTE:  The lawyers exercise their strikes.

17          THE CLERK:  The following jurors may return to their

18     seats in the courtroom:  Juror number 13, ███████████.  Juror

19     number 73, ████████.  And juror number 46, ██████████████.

20          NOTE:  The above-named jurors return to their seats

21     in the courtroom.

22          THE CLERK:  As I call your name, would you please

23     come forward and have a seat in the jury box as instructed by

24     our court Court Security Officer.

25          Juror number 28, ████████.  Juror number 6,

113

1 ████████████████.  And juror number 32, ████████████████.

2          NOTE:  The lawyers exercise their strikes.

3          THE CLERK:  The following jurors may return to their

4 seats in the courtroom:  Juror number 32, ████████████████.

5 And juror number 6, ████████████████.

6          NOTE:  The above-named jurors return to their seats

7 in the courtroom.

8          MR. TRUMP:  Judge, may we approach?

9          NOTE:  A sidebar discussion is had between the Court

10 and counsel out of the hearing of the jury panel as follows:

11 AT SIDEBAR

12          THE COURT:  Yes, sir.

13          MR. TRUMP:  Judge, six of the eight strikes by the

14 defense have been women.  Gender is a Batson category.  And,

15 frankly, I don't see any objection to the last several, any

16 reasonable reason to strike the last several jurors.

17          I think they are attempting to have a jury of

18 predominantly women, which is not -- under Batson would be

19 precluded.

20          MR. WALSH:  I'm not sure I heard what Mr. Trump said

21 correctly.  I'm striking women or I'm not striking women?

22          MR. TRUMP:  Six out of your eight strikes have been

23 men.

24          THE COURT:  Oh.

25          MR. WALSH:  We can go through them one at a time if

114

1    the Court wants us to.

2              THE COURT:  Go ahead.

3              JUROR WALSH:  Yes.  Can the Court tell us the number

4    and then I will explain?

5              THE COURT:  Number 2, ██.

6              MR. WALSH:  Number 2, ██, 9-1-1 call dispatcher

7    Fairfax County, law enforcement.

8              THE COURT:  All right.  70, ██████.

9              MR. WALSH:  70, DEA law enforcement, Arlington County

10   police officer associated with them.

11             THE COURT:  All right.  ███████, number 10.

12             MR. TRUMP:  That's a woman, number ten.

13             THE COURT:  I'm sorry?

14             MR. TRUMP:  That's a woman, number 10.

15             THE COURT:  I'm sorry.  How about --

16             MR. TRUMP:  46, 73 --

17             THE COURT:  All right.  Okay.  I'm sorry, I clearly

18   reversed my questioning.

19             MR. WALSH:  So ███████████.

20             THE COURT:  Yes.

21             MR. WALSH:  His father is a law enforcement officer.

22   He was a close call.  I moved to have him strike for cause

23   before.  His mother was a victim of a drive-by recently.

24             THE COURT:  Yes.  27 is ██████, the attorney.

25             MR. WALSH:  27, yes.  Yes, his father was Boston law

1   enforcement.

2           THE COURT:  Yeah.  30 years ago, that was enough for

3   you?

4           MR. WALSH:  That was enough for me.

5           THE COURT:  Okay.

6           MR. WALSH:  Next one.

7           MR. TRUMP:  73.

8           THE COURT:  Yeah, ███████.

9           MR. WALSH:  73?  I will put 73 back in there, I would

10  love to.

11          THE COURT:  You struck 73.

12          MR. TRUMP:  You've already struck 73.

13          MR. WALSH:  I struck 73, but I'll be honest with you,

14  I had second reservations once I handed that board up.  His

15  drug treatment, and his brother is a correctional officer.  I

16  felt there was a time with law enforcement -- however, I would

17  withdraw that, I would love to put him back in.

18          THE COURT:  I'm not going to put somebody back in at

19  this stage.

20          MR. TRUMP:  6 and 32.

21          MR. WALSH:  Six, his wife is Department of Homeland

22  Security.

23          MR. TRUMP:  I believe his wife works for Homeland

24  Security.  There is a difference between Homeland Security and

25  the Homeland Security Office.

116

1      MR. WALSH:  That's true.  Still it's law enforcement.

2  And what was the other one?  32?

3      MR. TRUMP:  32.

4      MR. WALSH:  He is a republican, second amendment

5  supporter, environmental impact, a UPS truck driver.  The

6  Second Amendment concerned me with the guns.

7      MR. TRUMP:  Just for the record, I have none of that

8  information.  So it's obvious that they have done a little

9  research on the jurors, which if they're going to base their

10  argument on that research, we're entitled to know what it is.

11      MR. WALSH:  Well, Judge, I will give him a copy of my

12  sheet where all the reports are, all the names of the other 70

13  or 100 defendants that we struck for.

14      THE COURT:  All right.  Your exemption is noted.  I'm

15  going to allow the jury selection process to proceed.

16      MR. WALSH:  Thank you, Your Honor.

17      NOTE:  The sidebar discussion is concluded; whereupon

18  the case continues before the jury panel as follows:

19  BEFORE THE JURY PANEL

20      THE CLERK:  As I call your name, would you please

21  come forward and have a seat in the jury box as instructed by

22  our Court Security Officer.

23      Juror number 35, ███████████.  And juror number

24  74, ███████████.

25      NOTE:  The lawyers exercise their strikes.

117

```
1          THE CLERK:  The following jurors may return to their
2  seats in the courtroom:  Juror number 74, ██████████.  And
3  juror number 35, ██████████.
4          NOTE:  The above-named jurors return to their seats
5  in the courtroom.
6          THE CLERK:  As I call your name, would you please
7  come forward and have a seat in the jury box as instructed by
8  our Court Security Officer.
9          Juror number 68, ██████████.  And juror
10 number 51, ██████████.
11         NOTE:  The lawyers exercise their strikes.
12         THE CLERK:  The following juror may return to their
13 seat in the courtroom:  Juror number 51, ██████████.
14         NOTE:  The above-named juror returns to her seat in
15 the courtroom.
16         THE CLERK:  As I call your name, would you please
17 come forward and have a seat in the jury box.
18         Juror number 64, ██████████.
19         NOTE:  No further strikes are taken of the regular
20 jury.
21         THE CLERK:  As I call your name, would you please
22 come forward and have a seat in the jury box as instructed by
23 our Court Security Officer.
24         Juror number 22, ██████████.  Juror number 33,
25 ██████████.  Juror number 43, ██████████.  And juror
```

118

1    number 76, ███████████.

2              NOTE:  The lawyers exercise their strikes.

3              THE CLERK:  The following jurors may return to their

4    seats in the courtroom:  Juror number 22, ████████████.  And

5    juror number 33, ████████████.

6              NOTE:  The above-named jurors return to their seats

7    in the courtroom.

8              THE COURT:  Any objection to the composition of the

9    jury?

10             MR. TRUMP:  No, good morning.

11             MR. WALSH:  No, Your Honor, we are satisfied.  Thank

12   you.

13             THE COURT:  All right.  Let's swear our jury then.

14             THE CLERK:  Would the defendant please rise and face

15   the jury.

16             Jurors, would you now stand, raise your right hand,

17   and after the oath is administered respond by stating "I

18   shall."

19             NOTE:  The jury for the case is sworn.

20             THE COURT:  All right.  Joe, do our remaining jurors

21   need to go to a different courtroom, sir?

22             COURT SECURITY OFFICER:  No, sir, they may go home or

23   go to work, but they have to call the 866 number after

24   6 o'clock tonight.

25             THE COURT:  All right.  Ladies and gentlemen, before

119

1    you leave, one minute.  I want to thank you for coming in this

2    morning and making yourselves available to sit as jurors.  It's

3    a very, very important responsibility of each one of our

4    community members.

5           It's also so important to our administration of

6    justice.  It separates us from the rest of the world.  There is

7    nothing better than having members of the community with

8    experience to bring their knowledge and life-long experiences

9    to the courtroom here and decide the very important and

10   difficult decisions that are made here every day.

11          I know I will hear a collective sigh of relief when

12   you get to the elevators that you haven't been selected, and I

13   understand that, but I sincerely hope that you'll get the

14   opportunity to sit sometime in the near future.  It's a

15   wonderful and important experience.

16          All right.  Thank you all again.  You're excused at

17   this time.

18          NOTE:  Those jurors not selected for jury duty are

19   excused and leave the courtroom.

20          THE COURT:  All right, ladies and gentlemen, I'm

21   going to excuse you in just a moment so we can have our lunch

22   break, but let me give you some preliminary instructions, if I

23   can have your attention for just a couple of minutes.

24          Now that you've been sworn, let me explain how the

25   case will proceed.  First, the Assistant United States Attorney

120

1    will make an opening statement outlining their case.   The

2    defendant's attorney may also make an opening statement

3    outlining his case immediately after the Government.

4              In their opening statements, the lawyers will tell

5    you what they expect the evidence to be, and this should help

6    you understand the evidence as it is presented through the

7    witnesses later and make you aware of conflicts and differences

8    that may arise in the testimony.

9              What counsel say in their opening statements is not

10   in evidence and you must not consider it as evidence.   And

11   neither side is required to make an opening statement.

12             After opening statements, the Government will present

13   its witnesses, and counsel for the defendant may cross-examine

14   them.

15             Following the Government's case, the defendant, may

16   if he chooses, present witness, whom the Government may then

17   cross-examine.

18             At the conclusion of all the evidence I will give you

19   the instructions on the law, and the attorneys will again

20   present their closing arguments to summarize and interpret the

21   evidence for you.

22             You will then retire, select a foreperson,

23   deliberate, and arrive at your verdict.

24             You must not be influenced in any degree by any

25   personal feeling or sympathy for or prejudice against the

121

1    Government or the defendant, for each is entitled to the same

2    fair and impartial consideration.

3           As I indicated, I will give you instructions on the

4    law at the end of the case more fully, but let me give you some

5    preliminary instructions now.  And it's your duty to follow the

6    law whether you agree with or not.

7           It's also your duty to determine the facts from the

8    evidence and the reasonable inferences arising from such

9    evidence.  And in doing so, you must not engage in guesswork or

10   speculation.

11          The evidence from which you will find the facts

12   consists of the testimony of the witnesses, documents and other

13   exhibits entered into evidence, and any facts that the lawyers

14   agree to or stipulate to or that I instruct you to find.

15          The admission of evidence in court is governed by

16   rules of law that have been developed over many years.  And the

17   purpose of these rules of evidence is to protect the fairness

18   and the accuracy of the fact-finding process in which you are

19   engaged.

20          From time to time it may be the duty of the lawyers

21   to make objections.  It is my duty to rule on those objections

22   and determine whether you can consider certain evidence.  Do

23   not concern yourself with any objection or hold it against the

24   side making an objection.

25          If an objection is overruled, treat the answer like

122

1    any other.  If you're instructed that some item of evidence is

2    received for a limited purpose only, you must follow that

3    instruction.

4            Statements, arguments, questions by lawyers are not

5    evidence.  You must not consider testimony or exhibits to which

6    an objection was sustained or which have been ordered stricken.

7    Nor should you consider anything you may have seen or heard

8    outside of the courtroom.  You are to decide this case solely

9    on the evidence presented here in the courtroom.

10           There are two kinds of evidence, direct and

11   circumstantial.  Direct evidence is a direct proof of a fact,

12   such as testimony of an eyewitness.

13           Circumstantial evidence is proof of facts from which

14   you may infer or conclude that other facts exist.

15           I will give you further instructions on these rules,

16   but keep in mind you may consider both kinds of evidence.

17           After the conclusion of all the evidence and after I

18   have read the instructions of law to you, the closing arguments

19   will be made and the lawyers will refer to testimony that you

20   heard.  Here again, what the lawyers say in their closing

21   arguments is not evidence.  Their statements are only their

22   personal recollection of the evidence.

23           It's important for you to keep in mind that no

24   statement, or ruling, or remark that I make during the course

25   of this trial is intended to indicate my opinion of the facts.

123

1    You are to determine the facts of the case.  In that

2    determination, you alone must decide the believability of the

3    evidence and the weight and its value.

4            In considering the weight and value of the testimony

5    of any witness, you may take into consideration the appearance,

6    attitude, and behavior of the witness, the interest of the

7    witness in the outcome of the trial, the relation of the

8    witness to any party in the case, the inclination of the

9    witness to speak truthfully or not, the probability or

10   improbability of the witness' statement, and all other facts

11   and circumstances that are in evidence.

12           Thus, you may give the testimony of any witness such

13   weight and value as you may determine that that testimony is

14   entitled to receive.

15           Pay careful action to the testimony of the witnesses

16   because, contrary to what you've seen on television, it's not

17   possible to call witnesses back or read their testimony to you

18   while you are deliberating.

19           As you know, this is a criminal case, and there are

20   three basic rules about criminal cases.  First, the defendant

21   is presumed innocent until proven guilty.  The indictment

22   against the defendant brought by the Government is only an

23   accusation, nothing more.  It is not proof of guilt or anything

24   else.  The defendant, therefore, starts out with a clean slate.

25           Second, the burden of proof is on the Government

124

1   until the very end of the case.  The defendant has no burden to

2   prove his or her innocence, or to present any evidence, or to

3   testify.  Since the defendant has the right to remain silent,

4   the law prohibits you from arriving at your verdict by

5   considering that the defendant may not have testified.

6           Third, the Government must prove the defendant's

7   guilt beyond a reasonable doubt.  I will give you further

8   instructions on this later.  But bear in mind, in this respect

9   a criminal case is different than a civil case.  The burdens of

10  proof are higher in a criminal case than in a civil case.

11          Until this case is submitted to you for deliberation,

12  you must not discuss the case among yourselves or with anyone

13  else, and you must not remain within hearing distance of anyone

14  who is discussing the case.

15          To avoid the possible appearance of impropriety, I

16  strongly urge that until the case is concluded you should not

17  talk at all with anyone connected with the case as a party,

18  witness, attorney, or me as the judge.  We may see each other

19  in the courtroom, or we may see each other in the elevators, or

20  outside the front of the building, and if counsel in the case

21  looks the other way when they see you in the elevator instead

22  of greeting you, it's because we very zealously protect the

23  privacy interests of our jurors, and they have been instructed

24  not to do anything more than nod a head in acknowledgment to

25  you.

125

1          Do not read or listen to anything touching on this

2   case.  If anyone should try to talk to you about it, bring it

3   to my attention immediately.  Do not do any research or

4   investigate the case on your own.

5          After the case has been submitted to you, you must

6   discuss the case only in the jury room when all members of the

7   jury are present.  You are to keep an open mind and you should

8   not decide any issue in this case until the case is submitted

9   to you for deliberation under the instructions.  Remember,

10  there are two sides to every story.

11         If you wish, you may take notes.  If you do, leave

12  them in the jury room when you leave at night.  And remember

13  that they are for your own personal use, they are not to be

14  given or read to anyone else.

15         When you are excused for court recesses or other

16  legal matters, please go directly to the jury room.  You will

17  find restrooms and telephone there for your use.  Make

18  yourselves comfortable, and we'll get you back in the courtroom

19  as soon as we're able to.

20         If you have any other needs during the course of the

21  trial, Mr. Ruelas is in your good hands and he will do his very

22  best to make your stay here as comfortable as possible.

23         I'm going to order a rule on witnesses which will

24  require fact witnesses to remain outside of the courtroom so

25  that they are not listening to the testimony of other witnesses

126

1   which might affect their own testimony.  And part of that rule

2   on witnesses will be that they remain outside in the witness

3   room until they are called.  That they not discuss the case or

4   the testimony that they have given with other witnesses or any

5   other party during the course of the trial.

6             All right.  I'm going to excuse you now for an hour.

7   We will come back at 2:40.  We will hear opening statements at

8   that time.  And we will go until 5:30, about 5:30.  Is that all

9   right with everybody?

10            And as far as the daily schedule, we will begin at 9.

11  We will take a mid-morning break.  And we'll break around

12  1 o'clock for lunch each day for an hour.  And we'll take a

13  mid-afternoon break for -- I think they will each be around

14  15 minutes.  And then we'll try and go until around 5:30 each

15  night.  And we'll sit tomorrow through Friday.

16            All right.  Thank you.  You are excused at this time.

17            NOTE:  At this point the jury leaves the courtroom;

18  whereupon the case continues as follows:

19  JURY OUT

20            THE COURT:  All right.  So anything before we break?

21            MR. PETROVICH:  I don't think so, Your Honor.

22            THE COURT:  Okay.  I'll come in before the jury after

23  each recess, and I will wait until after the jury goes back in

24  the jury room.  If we have got issues we expect to raise with

25  the next witness or other issues that come up, let's do it

127

1    while our jury is in the jury room versus at sidebar, for

2    obvious reasons, that they dislike it and they think

3    information is being withheld from them.  And also, it's

4    annoying to everybody.

5           So I know that can't be done every time, but let's do

6    our very best to identify issues that you think are coming up

7    before we get the jury in here.  Okay?

8           All right.  Then we'll see you in an hour.  We're in

9    recess.

10          NOTE:  At this point a lunch recess is taken; at the

11   conclusion of which the case continues in the absence of the

12   jury as follows:

13   JURY OUT

14          THE COURT:  All right.  Anything before we get our

15   jury for opening statements?

16          MR. AMINOFF:  Nothing from the Government, Your

17   Honor.

18          MR. PETROVICH:  No, Your Honor.

19          THE COURT:  All right, Joe, let's get our jury,

20   please.

21          NOTE:  At this point the jury returns to the

22   courtroom; whereupon the case continues as follows:

23   JURY IN

24          THE COURT:  All right, please have a seat.

25          We will have opening statements at this time.  Mr.

128

1    Aminoff, please, whenever you're ready, sir.

2            MR. AMINOFF:  Thank you, Your Honor.

3            In the dead of night on the remote east coast of

4    Honduras a group of men stood on an otherwise deserted beach.

5    They numbered a few dozen, some were young and some were old,

6    and each one was heavily armed.  They carried pistols and

7    assault rifles.  One even held a grenade launcher.

8            And they stood on that beach waiting for what is

9    called a go-fast boat.  It's a small vessel with a V-shape in

10   the front and big engines on the back.  It's capable of

11   travelling at high speeds while keeping a low profile.

12           And that go-fast boat they waited for was carrying

13   only three things:  A small crew, a few barrels of fuel, and

14   about half a metric ton of cocaine.

15           The boat pulled directly up to the beach and the

16   exhausted crew of sailors from Colombia staggered off of it.

17   While the armed workers unloaded the cocaine, one Colombian

18   crew member nudged the other and pointed out one of the

19   Honduran standing on the beach holding a pistol.  That's the

20   big man, he said to his companion, that guy is the boss.

21           And that boss, ladies and gentlemen, is sitting

22   before you today, the defendant.  His name is Arnulfo

23   Fagot-Maximo.  He was known to his associates as El Tio.  And

24   he was someone who was feared and respected throughout

25   Honduras, the man who controlled the drug trade in his coastal

129

1   town, and who received boat after boat carrying ton after ton

2   of cocaine in the manner that I just described.  Cocaine that

3   he would then redistribute to the other drug traffickers in

4   Honduras who could move it up the rest of the way to Mexico and

5   to the big cartels who bring it right here to the streets of

6   the United States and to the American drug user.  And as that

7   cocaine poured into the United States, millions of American

8   dollars flowed back and right into his pocket.

9          As a result, he has been indicted by a grand jury in

10   the Eastern District of Virginia with a conspiracy spanning

11   from 2006 through 2015 to distribute cocaine knowing or

12   intending that it would eventually be imported into the United

13   States.

14          Now, the judge will instruct you fully on the law.

15   And I expect that he'll tell you that a conspiracy is just an

16   agreement between at least two people to commit a crime.  It's

17   a sort of partnership for criminal purposes.

18          And the first step to understanding the defendant's

19   role in this conspiracy and to appreciating the link that he

20   played in this criminal partnership that moves drugs between

21   continents is to understand the basics of the international

22   cocaine trade.

23          And so, you're going to hear from an experienced

24   special agent in the DEA named Gregg Mervis, who will give you

25   a crash course on cocaine trafficking.  And he'll tell you that

130

1   to understand this, you need to first have an understanding of

2   how the geography of the region works.

3           Now, if I could direct your attention to the screen

4   either to your right or to the monitors in front of you.  And

5   just to orient ourselves, we're looking at the southern half of

6   the United States on the top of this map.  And on the United

7   States' southern border is, of course, Mexico.  Mexico on its

8   southern border has Guatemala.  And just to the southeast of

9   Guatemala is Honduras.

10          Directing your attention now to the bottom region of

11  the map, we can see the top part of South America.  And in the

12  northwest region of South America we find Colombia.

13          Now, these are some of the countries that Special

14  Agent Mervis will reference in his testimony.  And he'll tell

15  you that the largest base of cocaine customers in the world is

16  here in the United States, but that cocaine isn't produced

17  here.  It's by and large not produced in Mexico, nor in

18  Guatemala, not even in Honduras.  Rather, cocaine is produced

19  almost exclusively in South America.  And Colombia is the

20  biggest exporter of the drug.

21          Now, cocaine can't just be sent like a regular

22  product anymore, it's too difficult generally to just ship a

23  ton of cocaine directly from Colombia to the United States,

24  there is too much risk, there are too many opportunities to get

25  caught.

131

1         Instead, cocaine distribution typically operates

2    along an illicit chain of supply from trafficker to trafficker

3    and country to country, with each link critical in ensuring

4    that the drugs reach the United States where the customers are

5    and the big profits can be made.

6         And there are various routes that the traffickers can

7    take, but one of the most common begins by boat leaving

8    Colombia and arriving in Honduras.

9         And what Special Agent Mervis describes to you is

10   exactly what the evidence will show in this case.  You will

11   learn that the defendant controlled the area in and around the

12   town of Raya.  And that's marked here with a yellow dot on the

13   map.  And it's on the rural and remote east coast of Honduras,

14   just called the La Mosquitia coast.

15        And even though it is on the east coast, make no

16   mistake that La Mosquitia is the wild, wild west of Honduras.

17   This is a sparsely populated, barely governed area separated

18   from the rest of the country by a rain forest so thick that you

19   can't even get there by road.

20        But it is crucial territory in the cocaine supply

21   chain because it is a relatively safe and easy journey to move

22   the drugs there from Colombia.  It's easy because you can

23   literally point your boat at the appropriate angle from

24   Colombia, step on the gas and sail in a straight line and you

25   will arrive on the La Mosquitia coast.

132

1           And it's safe because it's possible to get there

2    sailing only at nighttime away from the eyes of the Coast Guard

3    if you come from the Colombian island of San Andres first,

4    which is also marked up there on the map.

5           Now, because of his crucial territory, over the

6    nine-year period charged you are going to hear evidence of a

7    defendant receiving thousands upon thousands of kilograms of

8    cocaine.  He would receive this cocaine on go-fast boats in the

9    middle of a night on a deserted beach near a property he owned.

10   His workers would unload it and take it to a nearby cabana to

11   be stored where it was kept safe from thieves and bandits by

12   his malitia, and it was kept safe from local law enforcement by

13   bribery.

14          And the defendant could keep the drugs there until

15   the coast was clear and night came again and other traffickers

16   were ready to receive the drugs in the rest of Honduras.  At

17   which point it would be typically packed back onto boats and

18   sent up through the north coast of the country.

19          And on that north coast you will learn that he

20   enjoyed a particularly close and symbiotic partnership with

21   another drug trafficking organization led by the

22   Montes-Bobadilla family, often called simply just the Montes.

23   And here we see two photographs of the leader of the

24   Montes-Bobadilla drug trafficking organization, Noe Montes,

25   he's in the red shirt in the photograph on the left and in the

1    white shirt on the photograph on the right.

2              Now, the Montes organization was based near the small

3    town of Limón shown on the north coast of Honduras there with

4    the red dot.  And they controlled much of the drug trafficking

5    in that area.

6              Now, the Montes would also buy their cocaine directly

7    from the Colombians, but they would often have the defendant

8    receive it for them in Raya in La Mosquitia, and the reason is

9    because it was easier and quicker and safer to get the drugs

10   from Colombia to Raya rather than trying to sail all the way

11   around to Limón.

12             So the defendant would receive their cocaine in Raya.

13   He would be paid in cash for his trouble or claim a portion of

14   their shipment as his own.  And then he would send the drugs up

15   to the Montes when the coast was clear and under the cover of

16   darkness.

17             And this relationship, you will learn, worked both

18   ways.  The defendant could also sell his own cocaine that he

19   purchased to the Montes, or he could send it up to the Montes

20   and have them resell it for him to other drug traffickers for a

21   fee.

22             But regardless of the arrangement for any individual

23   shipment of cocaine, it was through this productive partnership

24   of Raya and Limón, of the defendant and the Montes, that

25   together they moved thousands and thousands of kilograms of

134

1  cocaine from the Colombians to the rest of the drug traffickers

2  in Honduras.

3          Now, among the rest of the drug traffickers in

4  Honduras you will learn that their biggest customers were two

5  brothers, the Valle Valle brothers.  And the Valle Valle

6  brothers operated close to the Guatemala border in Honduras,

7  and they had the connections and the ability to move these ton

8  quantities of cocaine through Honduras and through Guatemala

9  and to the Mexican cartels, who could then get the drugs up to

10  the U.S. and get the dollars flowing back south.

11          Now, that's what I expect the evidence will show,

12  that the defendant was a significant link, a crucial link,

13  often even a necessary link, between the Colombian suppliers on

14  one hand and the traffickers who could move the drugs up to the

15  Mexican cartels on the other.  And that all of these

16  individuals were part of a conspiracy, a criminal partnership

17  to get the drugs to the U.S. to make the most money possible.

18          And you will see during this case that this was a

19  serious business.  And it was a serious business because there

20  was an incredible amount of money at stake.  One metric ton of

21  cocaine in Honduras is worth roughly 10 million U.S. dollars.

22  And we're going to be talking about ton after ton of cocaine

23  during this case.

24          So naturally, with that amount of money on the line,

25  the members of this conspiracy were careful.  And you've heard

135

1    some of the ways already.  They operated in the dark and on the

2    high seas, in some of the most remote and some of the most

3    violent corners of the earth.  Bribes were paid, foreign

4    officials corrupted, deadly weapons were ready and available

5    for use.

6            There is no doubt that this is an ugly and intricate

7    story.  And the way that we'll be able to prove the defendant's

8    part in it is by taking you inside of it and letting you hear

9    directly from the people that he worked with.

10           You'll hear from the Colombians that supplied him.

11   You'll hear from the Hondurans that bought from him and

12   laundered his money.  You'll hear from the Guatemalan who

13   delivered his drugs to the Mexican cartels.

14           These are people who have been charged in the United

15   States with drug trafficking who have admitted their

16   responsibility and are serving lengthy prison sentences and who

17   have agreed to cooperate fully, completely, and honestly with

18   the Government, including testifying at trials when called upon

19   to do so.  And they do this with the hope, but not the promise,

20   of a reduced sentence from the judge if they uphold their part

21   of the agreement.

22           You'll hear some of these people have done terrible

23   things, but these are the people the defendant chose to

24   associate with.  So these are the people the Government will

25   call as its witnesses.

1          So, ladies and gentlemen, we will call to that

2     witness stand a trafficker from the Colombian island of San

3     Andres who ran his own cocaine transportation organization,

4     that received drugs from mainland Colombia on San Andres Island

5     and then dispatched them on boats to the defendant.  Three,

6     even four boats a month, month after month, year after year.

7          Listen to the sheer quantity of narcotics this one

8     defendant and his organization sent to him, and it will give

9     you a sense of the almost unimaginable size and ambition of

10    this conspiracy.

11         You'll hear from a worker who physically drove one of

12    the go-fast boats sent by another organization on San Andres

13    Island to the defendant.  He will tell you about the long rides

14    in the middle of the night, about the armed militia that

15    awaited him on the beach, and about receiving millions of

16    dollars in sacks from the defendant to take back to his

17    Colombian bosses.

18         He will tell you he delivered drugs like this for

19    nearly ten years until the U.S. Coast Guard finally caught him

20    on a boat with over 500 kilograms of cocaine that was going to

21    this man here.

22         You'll hear from several Hondurans, including the

23    Valle Valle brothers whom I mentioned earlier.  They will tell

24    you how they bought cocaine directly from the Montes family and

25    directly from the defendant.  They will tell you how they had

1   an associate in Guatemala who transported the drugs up to the

2   Mexico border where it was sold to the big Mexican cartels.

3           And you will even hear from that Guatemalan, who was

4   responsible for moving millions of dollars of other people's

5   drugs and money, that he liked to write things down to make

6   sure he wasn't accused of stealing anything.  That like in any

7   business, he thought it was important to keep some of kind of

8   records.  And you will see in his records several entries

9   totaling millions and millions of dollars going back to El Tio,

10  the defendant.

11          Listen to their testimony and evaluate it using the

12  same common sense that you would use to evaluate anything else.

13  And I'm confident that when you take it all together, the

14  Colombian suppliers and the Honduran drug traffickers, the

15  money launderers, and the testimony of the DEA special agent,

16  that together this will lead you to one inescapable conclusion,

17  that that man moved thousands and thousands of kilograms of

18  cocaine and that he is guilty of the crime charged.

19          THE COURT:  Thank you, counsel.

20          Mr. Petrovich or Mr. Walsh.

21          MR. WALSH:  Good afternoon.  May it please the Court,

22  counsel for the Government, ladies and gentlemen of the jury.

23          As Judge O'Grady told you, the defense doesn't have

24  to do you an opening, but I'm going to just give you a brief

25  overview of what we think the evidence will show.

138

1          First off, Mr. Petrovich and I are privileged to

2     represent Arnulfo Fagot-Maximo.  We're going to refer to him as

3     Mr. Maximo to make it easy.

4          An overview.  You'll learn that Mr. Maximo is a

5     citizen of Honduras.  The U.S. government went down and

6     arrested him there and brought him into this Virginia court to

7     prosecute him.  And they are prosecuting him for conspiracy to

8     distribute five kilograms or more of cocaine knowing or

9     intending it to be brought into the United States.

10         We anticipate the evidence to show that he was

11    arrested in Puerto Lempira, he was arrested there in his home.

12    You will learn it was a peaceful arrest.  You will learn that

13    he didn't avoid or flee from the arrest.  There wasn't a

14    shootout or bribes to keep him from being arrested.  There

15    wasn't millions of dollars of cash with him.  There wasn't

16    cocaine with him.  There wasn't an arsenal of weapons or

17    bodyguards around him.

18         You will also learn that Honduras is the number one

19    murder country in the world.  Counsel referred to an expert.

20    The expert will tell you that these DTOs, or drug trafficking

21    organizations, they have large compounds.  They have

22    bodyguards.  You'll hear that they have large arsenals of

23    weapons.  That they engage in violent behavior, shootouts when

24    they're trying to be arrested.  They have killed people in

25    furtherance of their actions.  They have large amounts of cash

139

1   when they are seized.  They have numerous vehicles.

2           But you'll also see from the evidence, that you will

3   learn and the evidence will demonstrate that Mr. Maximo didn't

4   have any of that.

5           Mr. Maximo, as His Honor told you, is presumed

6   innocent.  So because he is presumed innocent and he is a

7   Honduran citizen in our system, the Government's case is on

8   trial today.  He's standing here, but their case is on trial,

9   you're judging their case.

10          So let's look at their case.  And I'm just going to

11  give you a brief overview.  The Government has mentioned the

12  inner workings of this organization, this drug trafficking.

13  And the Government has listed, you will hear from a Colombian,

14  you will hear from someone on a boat.  I'm going to name some

15  people.  You're going to hear from Arnulfo Valle Valle.  You're

16  going to hear from Luis Valle Valle.  Fernando Chang Monroy.

17  Richard Mosquera-Mosquera.  Anderson Lever.  Devis Rivera

18  Maradiaga.  Jose Lopez Morales.  And a few more, I don't have

19  to list them all.  But you will learn from the evidence that

20  will be presented how this system, our system works.

21          As I said, he is charged with a conspiracy to

22  distribute five, five kilos of cocaine that he knew was going

23  to come into this country.  But each of those people I named,

24  and there is a few more, are coming to this court with the

25  hopes of reducing their sentence.  That's how the system works.

1    They are defendants in other cases that have pled guilty.

2    You'll see in evidence there is plea agreements.  The plea

3    agreements are with these people, the Government.  And the plea

4    agreement is that they come here and testify because they want

5    a get-out-of-jail-early card.

6            You'll see from these plea agreements that only the

7    prosecution can do that, they're the only ones that can file a

8    motion to reduce their sentences.  So every one of those that

9    come out of that door, and I named them, are shooting to have

10   their sentences reduced.  Keep that in mind.

11           I believe you'll see in the plea agreements it says:

12   If in the sole and unreviewable judgment of the prosecution,

13   the defendant cooperated, cooperation is of such quality and

14   significance to the investigation, or prosecution of other

15   criminal matters as to warrant reduction, then they can reduce

16   the sentence.  They can ask to reduce the sentence.  That's the

17   magic wand, you'll see.

18           So let's talk about one of these defendants, Fernando

19   Chang Monroy.  You'll see from the evidence when he testifies

20   that he was interviewed -- he was arrested back in 2015, I

21   believe it was 2015.  You'll see he was interviewed on

22   December 17, 2015, about his involvements in this inner-working

23   system that we heard about.  You'll see that he was interviewed

24   December 18, 2015.  You'll see that he was interviewed

25   December 12, 2016.  You'll see he was interviewed January -- I

141

1    mean, excuse me, January 12, 2016.   January 13, 2016.   February

2    2, 2016.   February 3, 2016.   May 31, 2016.   June 17, 2016.

3    August 22, 2018.

4           He didn't ever mention Mr. Maximo.   Extensive

5    interviews, as you will see from the evidence.   Magically,

6    September 5, 2018 -- what, two months ago? -- he said he knew

7    of an individual named El Tio who operated with Noe Montes in

8    the Atlantic side of Honduras, La Mosquitia.

9           On one occasion Monroy sent Osmon Manya to pick up

10   5,000 kilos of cocaine from Fagot.   And on this occasion Manya

11   told Monroy that Fagot was present to receive the cocaine.

12   That was two months ago.   All of a sudden -- he has already

13   pled guilty, he has got a cooperation agreement, you will see

14   the evidence.

15          Then on October 30, 2018, I think that was last

16   month, he says on that interview with the Government, he

17   recalled narcotic transactions with Mr. Maximo.   Oh, wait, in

18   2010 he'll tell you he bought 800 kilos from him.   And he knows

19   that because he paid money in Mexico City and Guatemala.   He's

20   from Honduras.

21          The evidence will show magically on September 5 he

22   only knew of a guy two months ago, but then up to now he now

23   recalls all these transactions.

24          There is another gentleman, Arnulfo Valle Valle.

25   When he was interviewed back in 2015, he listed the major

142

1    traffickers.  Don Marcos.  Noe Montes-Bobadilla.  Carlos Lobo.

2    Don Cesar.  Wilter Blanco-Ruiz.  Devis Rivera Maradiaga.

3    Javier Maradiaga.  Never mentioned Mr. Maximo.  But he's the

4    inner workings of the system, you'll see the evidence.

5           He was interviewed on January 27, 2015.  He was

6    interviewed on January 28, 2015.  February 11, 2016.  I believe

7    it's February 12, 2016.  No mention.

8           But he does talk about a Tio.  And you will learn Tio

9    means -- I think El Tio means uncle.  It has other terms in the

10   Spanish language.

11          But you will hear that he dealt with a person named

12   Tio in Orlancho, which is in the middle of Honduras.  And that

13   Tio is a congressman who was dealing cocaine.  He sent his

14   workers down there to his farm, the cocaine would come back in

15   cattle shipments, 700 to a thousand kilos.

16          At the end of 2015 this gentleman, Arnulfo Valle

17   Valle, hired an attorney named Robert Feitel, who happens to

18   represent another person up the chain too.  And it was after

19   that that Mr. Valle Valle decided to say, oh, yeah, I do know

20   Mr. Maximo.

21          You'll hear evidence of witnesses bribing police

22   officials to get cocaine through the inner workings.  You'll

23   hear evidence of government officials getting bribed.  You'll

24   hear evidence of cocaine being sold by government officials

25   down there.  And also government officials buying cocaine.

143

1        You will hear acts of violence, there is murders in

2   furtherance of that.  And when you hear all those, you'll never

3   hear any of that concerning him.  And the evidence will show no

4   bribes, no murders, no nothing.

5        The evidence will demonstrate that when Mr. Maximo

6   was arrested, he wasn't seized -- you'll see, the evidence will

7   demonstrate, he didn't have a bunch of cocaine, loads of money.

8        They say that -- the Government says he owns this

9   property near the beach.  Well, we'll question that.

10       As I said, the Government's case is on trial today.

11  You're the judges.  You're the judges -- you're the judges of

12  the witnesses, the credibility of the witnesses, and you judge

13  the facts, and you make the call on the Government's evidence.

14       At the conclusion of the evidence in the trial my

15  partner, Mr. Petrovich, will address you.  He's going to ask

16  you to return a verdict of not guilty.

17       Thank you.

18       THE COURT:  All right.  Thank you, Mr. Walsh.

19       NOTE:  The jury selection and opening statements of

20  counsel are concluded.

21       -------------------------------------------------

22

23       I certify that the foregoing is a true and
         accurate transcription of my stenographic notes.

24

25       /s/  Norman B. Linnell
         Norman B. Linnell, RPR, CM, VCE, FCRR